Karl KERSHNER and Helen Kershner, Appellants,

v.

Virginia Jones HURLBURT, as Executrix, under the Last Will and Testament of W. D. Jones, Deceased, Lillie Jones, R. A. Benitez and Fannie Benitez, Respondents.

No. 44414.

Supreme Court of Missouri.

Division No. 1.

April 11, 1955.

Routh & Hecke, Dewey Routh, Rolla, for appellants.

Llyn Bradford, Rolla, James W. Faris, St. Louis, for respondents.

COIL, Commissioner.

The trial court denied appellants specific performance which they sought by reason of a written contract between them and W. D. Jones and his wife Lillie Jones pertaining to certain realty. W. D. Jones died after the institution of the suit and his executrix was substituted as defendant. Respondents Dr. R. A. Benitez and his wife Fannie purchased the involved property from W. D. and Lillie Jones. Appellants

contended that the conveyance constituted a breach of the contract not to sell unless the first right to purchase at a fixed price was refused by appellants. The trial court's judgment was "that Specific Performance hereby is refused, and that plaintiffs' petition be and hereby is dismissed."

The Kershners' (appellants') house in Rolla, Missouri, fronted on North Tenth Street and their side yard extended eastwardly to Rolla Street. The Jones house (respondent Lillie Jones and W. D. Jones, her deceased husband) faced Rolla Street. Both the Kershner and Jones properties extended from Rolla Street on the east to an alley on the west. South of the Jones and north of the Kershner properties, and between and adjacent to each, were two full lots and a part of a third, which lots also extended from Rolla Street to the alley. There was an oral understanding between the Joneses and the Kershners that if Jones purchased the lots between their respective properties for $2,550, the Kershners would buy one half the ground for $1,275. Jones did purchase the lots for $2,550 and on July 10, 1945, obtained a warranty deed to them. On July 21, 1945, Mr. and Mrs. Jones conveyed to the Kershners by warranty deed the west half of the lots. On the same day the Joneses and Kershners entered into this contract:

"This agreement made and entered into this 21st. day of July, 1945, by and between W. D. Jones and Lillie Jones, his wife of Rolla, Missouri, parties of the first part, and Karl Kershner and Helen Kershner, his wife, of Rolla, Missouri, parties of the second part.

"Witnesseth: That whereas the said parties of the first part purchased Lots fourteen (14) and fifteen (15) and five (5) feet off of the North side of Lot thirteen (13), in Block eighty seven (87), Bishop's second addition to the city of Rolla, Missouri; and whereas said property also adjoined property of the said second parties in said block; and whereas the said parties of the first part have this day sold unto the said parties of the second part the West half of Lots fourteen (14) and fifteen (15) and the North five (5) feet off of Lot thirteen (13) in said Block eighty seven (87) Bishop's second addition to the city of Rolla, Missouri; and whereas, there is located on said lots, a small three room frame dwelling house which is now rented for $10.00 per month. It is, therefore, agreed between the parties hereto that if at any time the said parties of the first part desire to sell the East half of said lots which they have retained title to, that they will give to the parties of the second part, the first right to purchase said property at the price and sum which said parties of the first part paid for said property; and it is further agreed that if the said parties of the second part should desire to sell the West half of said lots which they have this day purchased from parties of the first part, that they will give the parties of the first part the first right to purchase said property at the price and sum which they paid the parties of the first part for said property; and if either parties improves said property before sale, the costs of the improvements to be added to the purchase price of said property.

"It is understood and agreed that each party is to have one half of the rent collected on the dwelling house above mentioned while the same is rented and that in case of destruction of said premises by fire, each party is to be entitled to one half of the insurance, if any, collected for the loss of said property."

The contract, although signed on July 21, 1945, was not acknowledged by the parties until February 9, 1950. The contract was recorded on February 25, 1950.

On July 3, 1952, Mr. and Mrs. Jones conveyed to respondents Benitez the east half of the lots for $3,500. Prior to the date of that deed, respondents Benitez began and had "pretty well completed" the construction of a 1-story, 28 x 35, brick building on the east half of the lots. This was done under some kind of an arrangement between Jones and Benitez by which Benitez proceeded with the construction of the building even though he did not receive a deed until he had paid all of the $3,500 purchase price.

It was and is appellants' position that the sale by Jones to Benitez was a breach of the contract, in that Jones did not first offer to sell the property to appellants for $1,275; that respondents Benitez had actual as well as constructive notice of the contract; and that consequently appellants were entitled to specific performance against all respondents.

Either in the spring or winter of 1952, Mrs. Jones was offered $4,000 for the east half of the lots and $4,000 for the Kershners' west half. She conveyed this information to the Kershners. Mr. Kershner testified that he answered that they (the Kershners) "would prefer to stand by the agreement; we wouldn't pay more than the purchase price," and that Mrs. Jones answered "All right." Mrs. Jones testified that she conveyed the offer to Mrs. Kershner who said, "No; that it was their yard and they liked it and they wouldn't sell at any price" but that she would have Mr. Kershner call on his return from a trip; that Mr. Kershner did call and said, "Since he had time to talk it over, think it over, he decided he wasn't interested in buying at all"—to which Mrs. Jones replied, "You wouldn't release that contract, you wouldn't sell and you wouldn't buy?"—and that Mr. Kershner replied "No" and Mrs. Jones said "All right." Mrs. Jones also testified that what Mr. Kershner had said was that "he wasn't interested in buying or selling at $4,000."

■ It is at once apparent that, if the conversations between Mrs. Jones and the Kershners reasonably may be construed as a compliance with the contract on the part of the Joneses, this is decisive of the case. However, while Mrs. Jones's statement that Kershner said he was not interested in *buying at all* might, standing alone, be construed as an abandonment of the contract by the Kershners, Cf. Grant v. Pagter, 133 Conn. 646, 53 A.2d 380, still, when the entire conversation as related by Mrs. Jones is considered, and even if Mr. Kershner's testimony as to the conversation is ignored, we may not hold that the statements of the parties as related by Mrs. Jones constituted

an abandonment by the Kershners of the terms of the contract. It seems clear, under the most favorable possible construction, that Mrs. Jones offered to sell the east half of the lots for $4,000 and not for $1,275, the amount fixed by the terms of the contract.

Mr. Kershner testified that, in early April, 1952, Dr. Benitez asked him whether he (Kershner) would cancel his agreement with the Joneses because he, Benitez, was going to erect a building on the portion of the property owned by the Joneses. Kershner replied that he would not cancel and Benitez said that he would proceed with the construction of the building under a 99-year lease from the Joneses.

■ The testimony of Dr. Benitez is conflicting and unsatisfactory in so far as it enables us to arrive at a definite conclusion as to the dates of his negotiations with the Joneses, the times of his talks with the Kershners, or the dates of the commencement and completion of the building. Reviewing all of his testimony, in the light of the Kershners' testimony, and making our own findings of fact as it is our duty to do, we are of the opinion that Dr. Benitez did tell Kershner that, in view of the fact that the Kershners would not release the Joneses from the contract, he (Benitez) would proceed to erect the building under a 99-year lease from the Joneses; that thereafter Benitez decided to buy the east half of the lots because he had made up his mind that the contract "was broken and that it wasn't valid any more"; that he began construction of the building in June 1952; that it was finally completed in the early part of August 1952; that by an early date in July 1952 the building was "pretty well completed" at least in so far as outside construction was concerned.

The Kershners made no protest while the building was being constructed because, according to Mr. Kershner, he thought, until some time in July, that Benitez was proceeding under a 99-year lease and that the written contract did not prevent such a lease. Some time in July Mr. Kershner first learned that Benitez had in fact purchased the property when he saw a report

in the local paper of the recording of a warranty deed from Jones to Benitez. This suit was filed August 6, 1952.

Benitez alleged in his answer that he had spent $5,000 on the building up to September 5, 1952, the date his answer was filed. He testified that he had spent $6,000 on the building up to the time the suit was filed on August 6. There was evidence that the reasonable market value of the property as improved with the 1-story brick building was $15,000 to $17,000 at trial time.

Among others, it is respondents' contention that the contract was unenforceable because it violated the rule against perpetuities and because it constituted a restraint on alienation.

■ There is, of course, a distinction between the rule against perpetuities and the rule against restraints on alienation. The rule against perpetuities fixes the time within which a future interest must vest, while the rule against restraints on alienation is to prevent the inalienability of present or future vested interests. American Law of Property, Vol. VI, § 26.2, p. 411; 70 C.J.S., Perpetuities, § 2b, pp. 575, 576.

■ Contracts, such as the instant one, which confer a right which may be enforced by specific performance are subject to the rule against perpetuities and to the rule against restraints on alienation. 41 Am.Jur., Perpetuities and Restraints on Alienation, § 35, p. 78; American Law of Property, Vol. VI, § 26.64, p. 506.

The instant contract does not create an option to purchase either in the Joneses or in the Kershners. It is not a contract for the sale of real estate, and it does not involve an option given in connection with a lease. As we view it, the contract attempted to create in the Kershners a right that the Joneses would make no sale of the east half of the lots without first offering the property to the Kershners for $1,275; in other words, a promise to make no sale without first giving the Kershners an option to purchase for $1,275. Likewise, the Kershners, in exchange for the Jones's promise, agreed not to sell the west half of the lots without first giving the Joneses an option to purchase that property for $1,275. This type of contract is sometimes referred to as one creating a pre-emption (American Law of Property, Vol. VI, § 26.64, pp. 506, 507), a contract containing a promissory restraint (Rest., Property, Div. IV, § 404, p. 2381), or a contract containing a continuing negative promise, H. J. Lewis Oyster Co. v. West, 93 Conn. 518, 531, 107 A. 138, 143[12]. The point, relevant for present purposes, is that no option to purchase arose unless the owner desired to sell. If he did, then the offeree had a short-lived option to purchase in accordance with the terms of his agreement. Corbin on Contracts, Vol. 5, § 1197, pp. 831–833.

■ The instant contract, reasonably construed, does not violate the rule against perpetuities because the rights conferred by it are personal to the holders thereof and terminated at their deaths. (Inasmuch as all four of the contracting parties were alive at the time of the alleged breach, we need not determine whether the contract rights existed during the life or lives of either or both the promisees or of either or both the promisors.) There is no specific provision that the contract shall be binding upon the heirs and assigns of the parties. Nor is there any indication in the contract that the parties intended that its terms would be binding beyond the lives of the parties. Thus, because the rights conferred by the contract were personal to the parties to it and did not extend beyond the periods of their respective lives, the instant contract does not violate the rule against perpetuities. Williams v. Diederich, 359 Mo. 683, 686[1], 223 S.W.2d 402, 403[1]; Campbell v. Campbell, 313 Ky. 249, 252, 230 S.W.2d 918, 920, 921; Winstanley v. Chapman, 325 Mass. 130, 132, 89 N.E.2d 506, 508[2]; Hall v. Crocker, 192 Tenn. 506, 510, 241 S.W.2d 548, 550[5, 6]; Rest., Property, Div. IV, § 393, Comment b, p. 2316. Cf. Morgan v. Griffith Realty Co., 10 Cir., 192 F.2d 597, 600[9, 10].

■ Does the instant contract unreasonably restrain alienation? That rule

is based upon (among other things) the desirability of "keeping property responsive to the current exigencies of its current beneficial owner" and upon the desirability of avoiding the retardation of the natural development of a community by removing property from the ordinary channels of trade and commerce. See Rest., Property, Div. IV, pp. 2379, 2380; American Law of Property, Vol. VI, § 26.1, p. 409; § 26.3, p. 412. However, not every restraint on alienation is undesirable and not every restraint on alienation should be prohibited. See American Law of Property, Vol. VI, § 26.4, p. 414; § 26.63, p. 505.

■ The instant contract does not by its specific language constitute any restraint upon alienation. This, because the contract permits the conveyance of either the west or east half of the lots to any person, provided it is first offered to the other parties at a stipulated price. Thus, a method *for* alienation is provided. However, it appears that, by reason of the inclusion of a stipulated price, the contract imposes a substantial restraint on alienation. This, because if there occurred a marked increase in the market value of the properties between the time of the contract and the time when either of the parties wished to sell, it is obvious that neither owner would sell.

We have found only one case apparently involving a substantially similar agreement. In Saraceno v. Carrano, 92 Conn. 563, 103 A. 631, a similar agreement was construed to mean that the promisee acquired no right unless the owner-promisor elected to sell *for the fixed price* and concluded that because nine years had elapsed and no election to sell *at the named price* had been made by the promisor, it would be presumed that she had elected not to sell. We reject that case as authority for our conclusion in the instant case. As stated in a comment in 28 Yale Law Journal 65, 67, the court, in the Saraceno case, by construing the contract to mean that the promisor had the right to *elect not to sell for the fixed price,* and by concluding that she, therefore, could terminate her contract obligation merely by so electing, "robs the contract, for which

he gave consideration, of all value to him, and is an unsound construction of the parties' expression of intention." (The comment proceeds, however, to suggest that a proper disposition of the case would have been to hold that the promisor-owner had only a reasonable time within which to elect to sell and that the lapse of nine years demonstrated that no election had been made within a reasonable time. We are unable to adopt this "reasonable time" suggestion as sound when applied to a contract like the instant one as distinguished from an option contract.)

■ In Magee v. Mercantile-Commerce Bank & Trust Co., 343 Mo. 1022, 1027, 124 S.W.2d 1121, 1124[5-7], we said that, to avoid the result of holding void for indefiniteness or as in violation of the rule against perpetuities options which fix no time for performance, a rule of "reasonable time under the circumstances" should be adopted; thus, reading into an option contract, which states no time limit, a provision that it must be performed in a reasonable time under the circumstances. See also Annotation, 162 A.L.R. 589. But we do not understand how the "reasonable time" rule applied to *option* contracts reasonably could be applied to a contract like the one under consideration. This because the plain implication of the instant contract is that it was to be effective during the lives of the parties and, irrespective of that, it would be most difficult ever to determine or to find any standard for determining what is a "reasonable time under the circumstances" where the "reasonable time" is sought to be applied to an owner-promisor rather than to an option holder.

The view is expressed in both Rest., Property, Div. IV, § 413, illustrations 1, 2, 3, p. 2442, and Comment on Subsection (2), Clause (a), p. 2444, and in American Law of Property, Vol. VI, § 26.65, p. 507, and § 26.67, p. 510, that where a contract like the instant one fixes the price at which property must be offered for sale, there is a substantial curtailment of the property's alienability and that such is obnoxious to the rule against restraints. These authori-

ties take the position that, where the contract provides that the sale shall be at the offerer's own price or at the price offered by another bona fide purchaser, there is no substantial restraint; but that where the price is stipulated and the value of the property at the time it may be offered for sale is much greater that its value at the time of the contract, there is an obvious restraint on alienation, since the owner will retain the property rather that sell it at a great sacrifice. American Law of Property, § 26.67, at p. 511, contains the statement that "The better reasoned cases have held such pre-emptions void." However, the courts, in the cases cited in the footnote to support that statement, while perhaps in a general way furnishing some basis for it, do not, in our judgment, base their decisions specifically upon the fact that a fixed price pre-emption contract was involved. In Washington University L.Q., 1952, p. 337, an article on "Satisfying Missouri's Perpetuity Rules" under a subheading "Restraints in Substance, Though Not in Form", states: "The terms of a conveyance may require that before conveyed land may be sold, a designated person, usually the grantor, must be given the first refusal. The extent of the restraint thus imposed upon the conveyee's freedom of alienation by such pre-emptive provisions will vary with the amount of the refusal price, which may or may not be set forth in the conveying instrument. If the price to be fixed must compare favorably with the value of the land, at the time alienation is sought, the restraint will be slight, and might well be upheld. However, if the price may be fixed at a price substantially lower than the then value of the land, the conveyee will be loath to sell, and a substantial restraint may thus be imposed which should not be permitted."

In Bing v. Burrus, 106 Va. 478, 56 S.E. 222, a restraint, that if either son of the testator wished to sell his part of the land, preference of purchase should be given to the other son provided the other son paid as much as could be obtained from any other purchaser, was held to be valid. In Henderson v. Bell, 103 Kan. 422, 423–424,

173 P. 1124, 1125, the court, in discussing the restraint there involved, pointed out that it was such that the one owning the fee was forced to sell at $65 an acre although at the time of the sale the land might well be worth $1,000 an acre. However, the decision in that case, holding the restraint invalid, seems to have been based on the fact that the future interest provided for was to vest at too remote a time. In Hall v. Crocker, supra, 241 S.W.2d 549, the restraint was this: " 'It is hereby expressly-agreed and understood that should the said Leehentz Bowles [grantee] desire to sell this land or should she die then the said W. L. Morris or his legal representatives. shall have the exclusive right to buy the same at the actual cost of improvements on said land should he so desire.' " The court held such to be a reasonable restraint on alienation. Note, however, that the consideration there was love and affection, and that the grantor had some apparent desirable purpose to be accomplished by the restraint. See also Dodd v. Rotterman, 330 Ill. 362, 369, 161 N.E. 756, 760 [12, 13], and Maynard v. Polhemus, 74 Cal. 141, 15 P. 451. And see the dictum in Elliott v. Delaney, 217 Mo. 14, 33, 116 S.W. 494, 499: "The general policy of the law is against unlimited restrictions upon the right of alienation. We do not mean, however, that for a valid consideration a person may not agree that he will not sell his property during his lifetime, and may not agree in his lifetime that a certain person shall have the right to say whether or not he will take the property at his death at a stipulated or an agreed price. If such agreement is made in writing, and placed of record, as in this case, it would no doubt bind both the heirs and the administrator or executor of the party making it."

■ All of which causes us to conclude that, whether a particular restraint in substance on alienation like or similar to the instant one, and imposed by contract as in the present case, and which does not. violate the rule against perpetuities, is valid or invalid depends on whether or not it is reasonable or unreasonable under the particular facts and circumstances. Thus, we-

do not subscribe to the view that every restraint which is for life or lives and whether effected by specific language absolutely prohibiting a sale or by a provision fixing a price at which property must be offered for sale to one before it may be sold to another, is invalid. As noted, we adopt the view that contracts, such as the one in question, which require an offer to a specified person at a fixed price before the property may be sold to another, are valid or invalid, depending upon the purpose or purposes to be accomplished by the particular contract.

An analysis of the provisions of the instant contract makes it apparent that no object other than a restraint on alienation of the lots in question could have been accomplished by the contract. While Mr. Kershner testified that the purpose of the contract "was to prevent the encroachment of undesirable buildings which would be injurious to the values of both properties as residences", the contract itself not only does not evidence such a purpose but by its very terms negatives it. This, because the contract contains the provision that "if either parties improves said property before sale, the costs of the improvements to be added to the purchase price of said property." And there are no provisions which in any way restrict the kind, quantity, or quality of improvements which may be made by the owners of either the east or west half of the lots. The evidence was that the lots were in a commercial area. Thus, irrespective of what purpose the parties may have intended to accomplish, the fact is that their contract specifically negatives the possibility of the accomplishment of any desirable objective. The contract could not accomplish the maintenance of the lots as yards or decorative adjuncts to the parties' residences, or prevent the encroachment of commercial establishments, or, in so far as the agreement is concerned, prevent the use of the lots for any purpose whatever. And there is no prohibition or restriction in the contract as to leasing, either as to the identity of lessees, the length of a lease, or the purposes for which the property might be used under a lease.

The parties knew at the time the contract was executed that if the value of the lots substantially increased, the owners of either the east or west half of the lots would not offer their property to the owners of the other property at the fixed price of $1,275. And they knew that if property values remained stationary or decreased, they had obtained no substantial advantage by reason of the contract. Thus, in view of the provisions of this contract, it would appear that the parties had no other stated purpose, and could have accomplished nothing more, than to arbitrarily restrain the alienation of the lots for the lives of the respective parties. See 73 C.J.S., Property, § 13(b), pp. 195, 196. It does not appear that there was any relation between the restraint imposed and the accomplishment of any purpose other than the prevention of a sale. The restraint imposed was, at best, to require an option to come into being, but the restraint imposed effectively prevented that option from ever arising.

It follows that no socially or economically desirable objective could be accomplished by enforcing this contract despite the restraint on alienation brought about by the contingency of the substantial increase in the value of this land. Under these circumstances, we are of the opinion that the contract constituted an unreasonable restraint on the alienation of this property and for that reason, the trial court correctly refused to grant relief to appellants.

The judgment is affirmed.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.