**UNITED STATES of America,
Plaintiff-Appellee,

v.

James W. TOLBERT, Sr., Defendant-
Appellant.

No. 16494.**

United States Court of Appeals
Seventh Circuit.
Jan. 14, 1969.

Harvey M. Silets, Chicago, Ill., for defendant-appellant; Theodore A. Sinars, Harris, Burman & Silets, Chicago, Ill., of counsel.

James B. Brennan, U. S. Atty., Robert J. Lerner, Thomas R. Jones, Asst. U. S. Attys., Milwaukee, Wis., for plaintiff-appellee.

Before DUFFY, Senior Circuit Judge, and KILEY and FAIRCHILD, Circuit Judges.

KILEY, Circuit Judge.

Defendant Tolbert was convicted by a jury of income tax evasion for the years 1955 and 1956, in violation of 26 U.S.C. § 7201. He has appealed. We affirm.

Tolbert is the proprietor of Tolbert Oil Company which sells, at both wholesale and retail, various grades of gasoline and fuel oil together with miscellaneous items such as batteries, tires, and grease.

For the years 1955 and 1956, and some years prior, Tolbert, in reporting income, had computed his gross income by estimating an average profit per gallon for each grade of gasoline and oil, and then multiplying this by the total number of gallons sold for the year. He subtracted his deductible expenses in order to arrive at the adjusted gross income for the years. Using this method, Tolbert reported net profit of $3,043.43 and $5,489.16 from the business, and his adjusted gross income as $3,980.93 and $6,329.16, for the years 1955 and 1956, respectively.

Tolbert was indicted, after an investigation by the Internal Revenue Service. He was charged in one count with filing a fraudulent income tax return for 1955 by reporting adjusted gross income in the amount of $3,980.93 and tax payable in the amount of $567.30, when he knew that his adjusted gross income was $31,836.32 and tax payable was $9,380.37; and in a separate count with filing a

fraudulent return for 1956 by reporting taxable income of $3,296.25 and tax payable of $785.25, when he knew that his taxable income was $49,057.20 and his tax payable was $19,869.75.

He argues that some of the standards set by the Supreme Court in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), for net worth prosecutions have not been met, and that the district court erred in denying his motion for acquittal because the government's proof does not "exclude every other hypothesis but that of guilt." The Court in *Holland,* at 124, 75 S.Ct. 127, said that where the net worth method is used there is involved something more than the ordinary use of circumstantial evidence in the usual case, and courts of appeal should "bear constantly in mind" the difficulties that arise when circumstantial evidence is the "chief weapon" in the net worth method. 348 U.S. at 129, 75 S.Ct. 127. The Court rejected, however, at 139–140, 75 S.Ct. 127, a claim that the jury in these cases should be instructed on the rule Tolbert contends for, saying "the better rule" is that where the jury is instructed on *reasonable doubt,* the rule Tolbert contends for is "confusing and incorrect."

■ Holland v. United States establishes the rule that the government must prove the defendant's willful evasion of taxes by independent evidence and that this necessary element cannot be inferred from a mere understatement of income. Tolbert contends that there is no independent evidence of willfulness established by the government. We disagree.

We take the evidence most favorable to the government: Tolbert withheld information from his accountant, Lytle, who prepared the tax returns for the years in question. Lytle had several meetings with Tolbert and his wife in preparing their joint 1955 and 1956 returns. At their first meeting he advised Tolbert and his wife that it was usual to compute gross income by beginning with total sales and subtracting from that the cost of sales, computed by taking the opening inventory for the year, adding the purchases made during the year, and subtracting the year-end inventory. Lytle suggested that Tolbert keep a double entry accounting system, and Tolbert responded that he was on a commission basis. Lytle got the "impression" that Tolbert kept no books and records. During the trial, when confronted with six hardbound books which were single entry records of Tolbert's sales, Lytle testified he had never seen them before.

The six books contain information regarding defendant's wholesale sales, and his retail sales on credit. The agent was able to compute, for both years, defendant's gross sales from these books, and from this figure to compute his gross profit from wholesale operations by subtracting the cost of goods sold. The agent was not able to reconcile defendant's commissions earned figure reported in his tax return with the computations.

■ The evidence of Lytle and the agent is independent evidence of an understatement of income, from which, we think, the jury could have properly inferred a willfulness to evade taxes on Tolbert's part. The six books containing sales records would have been very useful to Lytle to compute net income, especially after he had advised Tolbert that the usual way to compute income was to start with gross sales. The jury could have found that Tolbert withheld these books from his accountant. The lack of evidence that he withheld information from the agent, once the investigation began, does not exculpate Tolbert. The pertinent proof of the element of willfulness was the withholding of books from Lytle.

We conclude that there is ample evidence in the record to justify the district court's denial of Tolbert's motion for acquittal. And we cannot say the evidence was not enough to justify the jury's inference that he was guilty of willfulness beyond a reasonable doubt.

Tolbert also contends the government failed to prove "obvious liabilities," and

failed to check out accounts receivable and other assets.

The substance of the first two contentions is that the government failed to check out leads given it in its investigation of Tolbert's fiscal affairs, as required by Holland v. United States, at 135, 75 S.Ct. 127. There is no merit in these contentions.

■ We reject the argument with respect to such obvious leads as taxes payable, wages payable, and other accounts payable, since Tolbert stipulated at the trial in great detail with respect to liabilities and cannot be heard to complain here.

■ Tolbert had furnished the agents a statement of financial condition as of December 31, 1956, listing his accounts receivable as $54,239.20. This same figure was used for the three net worth method starting dates, December 31, 1954, December 31, 1955, and December 31, 1956. Tolbert argues that the starting figure is inaccurate, that it is reversible error to have the same figure as accounts receivable for all three dates, and that the government failed to check out the reasons why the receivables actually increased. There is testimony that the accounts receivable did increase about $27,000 over the years 1955 and 1956. However, if this method of computation was inaccurate the error is in Tolbert's favor, and does not prejudice him. There would be prejudice only if the evidence showed, and it does not

show, that the accounts receivable decreased over the two years.

■ The assets on the starting date, December 31, 1954, were computed largely on the basis of stipulations and the defendant's tax returns. The tax returns contained a straight-line depreciation schedule which necessarily included the original cost of the depreciable assets, and their depreciation. From this, the depreciated value could be calculated. The value of the real estate was stipulated. After a careful review of all the evidence, we think there is substantial evidence to support the net worth calculations for the dates December 31, 1954, 1955 and 1956.

■ Tolbert gave no leads [1] with respect to the existence of substantial cash on hand, or to any other assets. He submitted two statements of financial condition, as of December 31, 1950, and December 31, 1956, listing his assets, including "other cash." He stated that none of his insurance policies had matured within the last ten years; that he had received $500 as beneficiary of a life insurance policy of his father, and that this money was used for funeral expenses; that he had no interest in any trust or estate; that he had not received any inheritance within the past ten years; that he had received no gifts of over $100 from anyone within the last ten years; and that he had no *assets of any kind, either actual or contingent, other than those listed herein."* (Emphasis added.)

1. The customary context of the word "leads" was stated by the Supreme Court in the *Holland* case, at p. 127, 75 S.Ct. at p. 131:

Among the defenses often asserted is the taxpayer's claim that the net worth increase shown by the Government's statement is in reality not an increase at all because of the existence of substantial cash on hand at the starting point. This favorite defense asserts that the cache is made up of many years' savings which for various reasons were hidden and not expended until the prosecution period. Obviously, the Government has great difficulty in refuting such a contention. However, taxpayers too encounter many obstacles in convincing the jury of the existence of such hoards. This is particularly so when the emergence of the hidden savings also uncovers a fraud on the taxpayer's creditors.

In this connection, the taxpayer frequently gives "leads" to the Government agents indicating the specific sources from which his cash on hand has come, such as prior earnings, stock transactions, real estate profits, inheritances, gifts, etc. Sometimes these "leads" point back to old transactions far removed from the prosecution period. Were the Government required to run down all such leads it would face grave investigative difficulties; still its failure to do so might jeopardize the position of the taxpayer.

We think these statements clearly refute any implication that defendant may have had another non-taxable source of income from which he acquired an increase in his assets.

The only other lead of importance shows that defendant sold a farm in 1953 for $65,000, and that in exchange he received a piece of land valued at $16,000, a $15,000 note and mortgage, and the balance of the money in cash. He deposited this cash in his bank account, together with $16,000 from a sale of land, and proceeds of the $15,000 note. This bank deposit was obviously not a hidden source of cash. We are not persuaded that the government did not check out leads in accordance with the requirement of Holland v. United States, p. 135, 75 S.Ct. 127.

We see no merit in the contention that the district court committed reversible error by admitting in evidence, for the government, over objection, a three page summary of defendant's net worth and expenditures as of December 31, 1954, 1955 and 1956. The final entry is a computed figure showing the defendant's increase in net worth over the years 1955 and 1956 to be $26,690.38 and $46,714.89.

■ Admission of summaries has recourts. United States v. Bernard, 287 F.2d 715, 722, (7th Cir. 1961), and cases cited therein.

■ The summary was prepared so that the jury could easily check its accuracy. Each entry, apart from the computations, was labeled as to its source. If the jury was doubtful about a particular item, they could have easily checked it. Moreover, they were instructed that this summary was not proof of any facts, and that if it did not correctly reflect the facts or figures shown by the evidence, the jury should disregard it. The Internal Revenue agent who prepared the summary, on the basis of his review of the material later introduced at the trial, testified at length as to the meaning of each item, and was subject to cross-examination as to its accuracy.

■ The case was tried for eight days. The jury was given the case at 4:32 p. m.; at 10:05 p. m. it requested a rereading of instructions on reasonable doubt (not granted because of defendant's objection); at 11:00 p. m. the court indicated it had "toyed" with the idea of giving the Allen instruction before releasing the jury; at 12:15 a. m. the Court gave the Allen charge [2] and the

2. The Court: Ladies and gentlemen of the jury, it is now 12:15, and you have had the case almost eight hours, and I want you to know that the Court appreciates the serious consideration that you are giving this case. But since you have had it for eight hours, at this time I would like to read to you an additional charge and then ask you to retire to consider it a little longer.

This is the additional charge I would like to read. In a large proportion of cases, absolute certainty cannot be expected. Although the verdict must be the verdict of each individual juror and not a mere acquiescence in the conclusions of others, yet you should examine the questions submitted with proper regard in deference for the opinions of each other, and you should listen to each other's opinions with a disposition to be convinced.

It is your duty to decide the case if you can conscientiously do so. If a much larger number of jurors favor conviction, a dissenting juror should consider the reasonableness of his doubt when it makes no impression upon the minds of other jurors equally intelligent and impartial who have heard the same evidence.

If, on the other hand, the majority favors acquittal, the minority should ask themselves whether they might not reasonably doubt the correctness of their judgment. Likewise, the jurors in the majority favoring a finding for either party should ask themselves whether they might not reasonably doubt the correctness of their judgment when it makes no impression upon the minds of the minority jurors equally intelligent and impartial as they are who have heard the same evidence.

If you should fail to agree on a verdict, the case must be retried. Any future jury must be selected in the same manner and from the same source as you have been chosen. And there is no reason to believe that the case would ever be submitted to twelve men and women more competent to decide it or that the case can be tried any better or more exhaustibly than it has

jury returned the verdict fifteen minutes later. Tolbert contends the instruction, under the circumstances, coerced the verdict, and that since the government's case is weak, the giving of the Allen charge is reversible error.

Since we have found ample evidence to sustain the conviction, we cannot agree that this case is weak.

In United States v. Furlong, 194 F.2d 1 (7th Cir.), cert. denied, 343 U.S. 950, 72 S.Ct. 1042, 96 L.Ed. 1352 (1952), this court said that the instruction there was proper, in so far as it followed the typical Allen charge. A concluding sentence, not within the typical Allen charge, was not objected to by Furlong, and was therefore not considered by this court. In a footnote in United States v. White, 382 F.2d 445 (7th Cir. 1967), this court said it did not find it necessary to "reconsider" the merits of the Allen charge, or to review the "unsolicited" giving of it. The note said however that the points argued (the charge *per se* and the timing of the charge) do not present plain error, and the body of the opinion did not discuss these arguments. In dissenting, Judge Cummings criticized a sentence in the instruction given in *White*: "If you should fail to agree on a verdict the case must be retried." The same sentence appears in the instruction before us. We agree with Judge Cummings that the statement in this sentence is untrue and could mislead the jury. However, what was said in the *White* footnote, and in the dissent there, applies here: there was no showing of undue prejudice from that sentence and hence there is no reversible error.

The charges in Jenkins v. United States, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965) was not the typical Allen instruction. There the judge told the jury "You have got to reach a decision in this case."

For the above reasons the judgment of the district court is affirmed.

been here, or that more or clearer evidence could be produced on behalf of either side.

Now, you may retire, and reconsider the evidence in the light of the Court's instructions. Thank you very much.