ESTATE OF PEARL GIBBONS REYNOLDS, DECEASED, WALTER EDWIN BIXBY, EXECUTOR, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1577–67—1579–67, 1605–67, 1606–67.   Filed October 29, 1970.

---

[1] Cases of the following petitioners are consolidated herewith: Estate of Angeline Reynolds Bixby, deceased, Walter Edwin Bixby, executor, docket No. 1578–67; Walter Edwin Bixby, docket No. 1579–67; Estate of Pearl Gibbons Reynolds, deceased, Walter Edwin Bixby, executor, docket No. 1605–67; and Estate of Angeline Reynolds Bixby, deceased, Walter Edwin Bixby, executor, docket No. 1606–67.

*Reece A. Gardner, George E. Gibson,* and *D. W. Gilmore,* for the petitioners.

*Bert L. Kahn,* for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioners' estate and gift taxes and has also made additions to those taxes pursuant to section 6651(a) of the Internal Revenue Code of 1954 and section 291(a) of the Internal Revenue Code of 1939 [2] for the years indicated as follows:

| Docket No. | Type of tax | Petitioner | Year | Deficiency | Additions to taxes |
|---|---|---|---|---|---|
| 1577–67 | Gift | Estate of Pearl Gibbons Reynolds, Walter Edwin Bixby, Executor. | 1947 | $36,171.57 | $9,042.89 |
| | | | 1948 | 1,147.50 | 286.88 |
| | | | 1953 | 24,766.12 | 6,191.53 |
| | | | 1961 | 765,462.92 | ........ |
| 1578–67 | Gift | Estate of Angeline Reynolds Bixby, Deceased, Walter Edwin Bixby, Executor. | 1947 | 725.25 | 181.31 |
| | | | 1948 | 688.50 | 172.13 |
| | | | 1950 | 528.75 | 132.19 |
| | | | 1953 | 82,084.12 | 20,521.03 |
| | | | 1958 | 10,224.00 | 2,556.00 |
| | | | 1961 | 370,912.39 | ........ |
| 1579–67 | Gift | Walter Edwin Bixby | 1961 | 328,283.44 | ........ |
| 1605–67 | Estate | Estate of Pearl Gibbons Reynolds, Deceased, Walter Edwin Bixby, Executor. | Year of death: 1962. | 11,322,504.16 | ........ |
| 1606–67 | Estate | Estate of Angeline Reynolds Bixby, Deceased, Walter Edwin Bixby, Executor. | Year of death: 1963. | 9,649,991.03 | ........ |

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954. The Internal Revenue Code of 1939 is hereinafter referred to as the 1939 Code.

The proceedings have been consolidated because the principal issue in each docket is whether respondent erred in determining the fair market value for estate and gift tax purposes of certain voting trust certificates.

Concessions having been made, the only other issues that remain for decision are whether respondent erred in his valuation of three promissory notes given in consideration for transfers of voting trust certificates and whether the failure to file gift tax returns in 1947, 1948, 1950, 1953, and 1958 was due to reasonable cause and not due to willful neglect so as to preclude imposition of the penalties provided in section 6651(a) and its analogue, section 3612(d)(1) of the 1939 Code.[3]

FINDINGS OF FACT

Many of the facts have been stipulated and are so found. The stipulation and exhabits attached thereto are incorporated herein by reference.

Petitioner in docket Nos. 1577–67 and 1605–67 is Estate of Pearl Gibbons Reynolds, deceased, Walter Edwin Bixby, executor. Petitioner in docket Nos. 1578–67 and 1606–67 is Estate of Angeline Reynolds Bixby, deceased, Walter Edwin Bixby, executor. Petitioner in docket No. 1579–67 is Walter Edwin Bixby.

For the years in issue, Pearl Reynolds (hereinafter referred to as Pearl) filed a gift tax return in 1961 but did not file gift tax returns in 1947, 1948, and 1953; Angeline Bixby (hereinafter referred to as Angeline) filed a gift tax return in 1961 but did not file gift tax returns in 1947, 1948, 1950, 1953, and 1958; and Walter Bixby (hereinafter referred to as Walter) filed a gift tax return in 1961.

At the time of filing of the petitions herein, Walter resided in Kansas City, Mo., where he also maintained his principal office as fiduciary of the two estates. The gift tax returns were filed with the district director of internal revenue at Kansas City, Mo. The estate tax returns were filed with the district director of internal revenue at St. Louis, Mo.

---

[3] Both parties have proceeded on the mistaken assumption that sec. 291(a) of the 1939 Code is the applicable provision for imposition of the 25-percent penalty for failure to file a gift tax return. Sec. 291(a) of the 1939 Code applies only to additions to the *income* tax. *Harry C. Porter, Transferee,* 49 T.C. 207, 208 fn. 1 (1967), supplemented by 52 T.C. 515 (1969). Sec. 3612(d)(1) of the 1939 Code governs the imposition of additions to the gift tax occasioned by the failure to file a gift tax return. See also sec. 894(a) of the 1939 Code (ad valorem penalties for failure to file estate tax return similarly governed by sec. 3612(d)(1) of the 1939 Code). With respect to the reasonable-cause issue the critical language of secs. 291(a) and 3612(d)(1) of the 1939 Code is virtually identical. Petitioner does not argue that this technical error should cause the burden of proof on the reasonable-cause issue to shift to respondent. Indeed, since he was not misled by respondent's reliance on section 291(a) of the 1939 Code such an argument would fail. See *J. T. Slocomb Co. v. Commissioner,* 334 F. 2d 269, 273–274 (C.A. 2, 1964), affirming 38 T.C 752 (1962)

Pearl was born in 1876 and died on December 7, 1962, of chronic myocardial failure. She was the surviving spouse of Joseph Reynolds. Angeline was born in 1900 and died on January 3, 1963, of lymphosarcoma. She was the sole child of Pearl and Joseph Reynolds. Walter was born in 1896 and is the surviving spouse of Angeline.[4]

The names and dates of birth of all of the descendants of Pearl and Angeline are as follows:

| Name | Date of birth |
|------|---------------|
| Sons of Walter and Angeline: | |
| Joseph Bixby | Apr. 7, 1925 |
| Walter Bixby, Jr | Feb. 12, 1932 |
| Daughters of Joseph Bixby: | |
| Kathryn Bixby | Nov. 28, 1949 |
| Nancy Bixby | May 23, 1952 |
| Children of Walter Bixby, Jr.: | |
| Angeline I. Bixby | Apr. 28, 1952 |
| Robert Bixby | May 12, 1953 |
| Walter Bixby III | Dec. 18, 1958 |

The Kansas City Life Insurance Co. (hereinafter referred to as the company) is a legal reserve life insurance company founded by Joseph Reynolds and incorporated under the laws of Missouri. As of January 1, 1963, it did business in the District of Columbia and all 50 States except Alaska, Hawaii, and the New England States. Since the company's incorporation in 1895, the number of shares outstanding and the stated capital of the company have changed as follows:

| | Shares increase (decrease) | Stated capital increase (decrease) |
|---|---|---|
| 1895 original issue | 250 | $25, 000 |
| 1903 original issue | 1, 000 | 100, 000 |
| 1904 capital reduction | (250) | (25, 000) |
| 1918 stock dividend | 1, 000 | 100, 000 |
| 1923 stock dividend | 3, 000 | 300, 000 |
| 1925 stock dividend | 5, 000 | 500, 000 |
| 1943 stock dividend | 30, 000 | 3, 000, 000 |
| Totals | 40, 000 | 4, 000, 000 |

Walter began working for the company in 1923. He was a clerk in 1923 and 1924, an assistant secretary from 1924 to 1937, executive vice president from 1937 to 1939, president from 1939 to 1964, and chairman of the board from 1964 on. His son, Joseph Bixby, succeeded him as president in 1964.

The Reynolds-Bixby family first acquired a 51-percent controlling interest in the company in 1916 or 1918 and have retained that interest

---

[4] Walter is a party to these proceedings in an individual capacity only by reason of the fact that Angeline elected to attribute one-half of the gifts she made in 1961 to her husband and Walter consented to that election.

directly until 1946 and indirectly through a voting trust since 1946. Before he died in 1937, Joseph Reynolds wished that the company's stock would gradually devolve upon his grandsons.

As of Joseph Reyonlds' death in 1937 Pearl and Angeline each owned 1,700 shares of the company's common stock. Upon Joseph Reynolds' death Pearl and Angeline each inherited an additional 850 shares of the company's common stock. Therefore, as of 1937 Pearl and Angeline each owned 25.5 percent of the 10,000 shares of the common stock of the company then outstanding.

From 1937 to 1946 both Pearl and Angeline engaged in a continuous program of making gifts to Joseph Bixby and Walter Bixby, Jr. From December 23, 1937, through February 9, 1946, Pearl made, either directly or in trust, 42 such transfers of the company's common stock. From December 23, 1937, through April 29, 1946, Angeline directly made 20 similar transfers of the company's common stock. After adjustment for the 1943 three-for-one stock dividend, the transfers through April 29, 1946, may be summarized as follows:

```
Pearl to Joseph Bixby—in trust_____  429
Pearl to Joseph Bixby_____  371
Angeline to Joseph Bixby_____  582
                                                              _____
    Transfers to Joseph Bixby_____ 1, 382
                                                              ======

Pearl to Walter Bixby, Jr.—in trust_____  429
Pearl to Walter Bixby, Jr_____  371
Angeline to Walter Bixby, Jr_____  582
                                                              _____
    Transfers to Walter Bixby, Jr_____ 1, 382
```

Prior to April 29, 1946, Joseph Bixby and Walter Bixby, Jr., had each acquired, by other means, four additional shares of the company's common stock.

Before 1946, Pearl, Angeline, and Walter often traveled together, and had talked about the possibility of their simultaneously dying in a train or automobile accident. They sought to adopt some mechanism which would enable them to perpetuate the company's management and policy in the event of such an accident. Pearl and Angeline also desired that the stock owned by the family should remain within the family. They believed that because of the youth of Joseph Bixby and Walter Bixby, Jr., the boys' interests in the company might be greatly endangered. In particular, they worried that the management of the company might be affected if one of the boys married, died young, and left a widow who might remarry.

They discussed using a holding company, foundation, or bank trust department as ways of providing for such eventualities. At the time of these discussions there was no concern that either Pearl or Angeline

would ever sell their company shares outside the family. They finally decided to place the stock in a voting trust which could be easily terminated in the event of the company's mutualization.

. The voting trust was created on April 29, 1946, by an agreement entitled "Agreement Creating Voting Trust" (hereinafter referred to as the voting trust agreement) which was executed by Ray Lucas, J. L. Batchler, and Walter as trustees (hereinafter referred to as the voting trustees) and by Pearl, Angeline, Joseph Bixby, the trustees for Joseph Bixby, and the trustees for Walter Bixby, Jr., as settlors.[5]

At the time the voting trust was created Angeline determined how the shares of Joseph Bixby and Walter Bixby, Jr., would be voted, but in any case Joseph Bixby, who was 21, and Walter Bixby, Jr., who was 14, were informed of the voting trust and did not object in any way to the arrangement.

Under the voting trust agreement the subscribers to the agreement transferred their shares of the company's stock to the voting trustees who in due course issued to each subscriber a Voting Trust Participation Certificate (hereinafter referred to as a certificate). Each certificate represented a number of units that the certificate holder owned in the voting trust. Each unit in turn represented the beneficial interest in one share of stock held in the voting trust.

With respect to the collection and distribution of dividends the voting trust agreement stated that:

7. The Trustees shall collect and receive all dividends that may accrue or be paid upon the shares of stock subject to this trust, and, subject to the deduction of necessary administrative expenses that said Trustees may incur in the execution of said trust, shall divide the dividends so collected among the Voting Trust Participation Certificate holders in propostion [sic] to the number of shares respectively represented by each Participation Certificate. Should the Trustees receive any shares of stock of the Company as a dividend upon the capital stock held by them, the Trustees shall hold the same subject to this trust agreement, and said shares shall be and become subject to all the terms and conditions hereof to the same extent as the shares in respect to which such additional shares are received. The Trustees shall issue Voting Trust Participation Certificates for such additional shares pro rata according to the number of their units in trust, to the registered holders of Participation Certificates as of such date as the Trustees may determine.

Limitations on the sale of the certificates were written into the voting trust agreement in order to prevent the certificates from being purchased by those unfriendly to the company or to its management. These restrictions upon the transfer of the certificates and the units they represented stated that:

9. The holders of Voting Trust Participation Certificates may by gift or devise dispose of said certificates, but said certificates received by any donee or devisee

---

[5] Angeline and Walter were the trustees of the company shares which had been placed in trust by Pearl for Joseph Bixby and Walter Bixby, Jr.

shall be subject to all the limitations and restrictions contained in the Voting Trust Agreement and the Voting Trust Participation Certificates.

10. In the event that the holder of any Voting Trust Participation Certificate or the administrator, executor or trustee of any such holder, at any time, shall desire to sell, pledge or dispose of his or her beneficial interest in the shares of stock of the said Kansas City Life Insurance Company represented by the said Voting Trust Participation Certificates, except as provided in Section 9 above, it is understood and agreed that said certificates are transferable only upon compliance with the following covenants and conditions which restrict the terms, conditions and price under which the certificates may be disposed of by such owners:

(a) The holder, his or her administrator, executor or trustee, shall first offer the same, or such part thereof as he or she desires to dispose of, to the other Subscribers of record to this Voting Trust Agreement at the time of such offer, and said Subscribers shall have the first chance to acquire the participation certificates so offered in proportion to the number of participation units held by each Subscriber, unless the privilege of acquiring is waived in writing by the Subscriber or Subscribers. In the event none of the Subscribers, within ten days after the offer is received by the Subscriber, elect to acquire the certificates so offered, then the holder shall offer the same to employees and agents of the Kansas City Life Insurance Company, and in that event the offer to dispose of shall be made in writing to the Secretary of the Kansas City Life Insurance Company, who shall transmit said offer of disposition to the Board of Directors of said Company at its next meeting, and said Board of Directors is hereby empowered, in its discretion, at said meeting, to select from the employees and agents of said Company the person or persons who may acquire said units, and said Board is further empowered to determine the number of units that may be acquired by the persons so selected, at the price determined by the formula set forth in subsection (b) of this Section 10. In the event the Board of Directors of said Company does not effect a disposition to employees or agent of the Company, then the said holder desiring to sell, pledge or dispose of his or her beneficial interest in the shares of stock of said Kansas City Life Insurance Company represented by said Voting Trust Participation Certificate may offer the same to any person at a negotiated price, however, said grantee or purchaser in any event shall take title subject to the limitations and restrictions imposed by the Voting Trust Agreement and said certificates.

(b) When Voting Trust Participation Certificates are offered for sale by any holder thereof, or his or her administrator, executor or trustee as prescribed in this agreement, the offering sale price (based on a 4 per cent yield) per unit, shall be a sum of money which is equal to twenty-five times the average annual cash dividend paid on a share of the common stock of the Kansas City Life Insurance Company over the last three year period preceding the date of said sale offer, but in the event the price per unit determined on by this formula is less than par value per share of the common stock of said Company, then in that event, the offering price per unit shall be the same as the par value per share of said common stock.

The provisions of article 10 are hereinafter alternately referred to as the first offer, first refusal, or preemption provisions and the selling price determined in article 10(b) is hereinafter referred to as the formula price.

The certificates clearly stated on their face that their sale or transfer was restricted by articles 9 and 10 of the voting trust agreement.

The company's chief actuary, with Walter's participation, developed the formula which determined the formula price. Pearl and Angeline never discussed the first-offer provisions of the voting trust. Furthermore, neither Pearl nor Angeline followed the price of the company's stock and neither of them discussed how the certificates would be valued at their deaths.

The duration of the voting trust agreement was governed as follows:

13. The trust hereby created shall continue for a term of twenty (20) years from the date hereof, and shall not be terminated prior thereto by the Subscribers hereof. Provided, however, that at any time within one year before the expiration of the said twenty year period the beneficial owners of the Voting Trust Participation Certificates representing two-thirds in amount of the shares of stock subject to this trust agreement may extend this trust agreement for such additional time as said beneficial owners may at that time choose to do, and the action of said beneficial owners of their desire to extend this agreement shall be by resolution adopted at a meeting of the Participation Certificate owners representing said two-thirds of the stock subject to this agreement, and a copy of said resolution shall be given to the then Trustees.

On May 11, 1965, following a meeting of the certificate holders, the voting trust agreement was in fact renewed for an additional period of 10 years until April 29, 1976.

The voting trust agreement also provided for termination by the voting trustees as follows:

14. In the event the Trustees, or a majority of the Trustees, with the consent of the Board of Directors of the Kansas City Life Insurance Company, at any time desire to terminate this trust agreement, they may do so by filing a declaration to that effect with the Kansas City Life Insurance Company and sending a copy of the same to each registered holder of a Voting Trust Participation Certificate issued hereunder.

This provision for termination by the voting trustees was made a part of the voting trust agreement in order to facilitate mutualization of the company if that eventuality ever arose.

Upon termination of the voting trust the voting trust agreement provided that the company shares held in trust would be returned to the certificate holders in exchange for the certificates.

The voting trust agreement provided that the voting trustees, or a majority of them, could authorize any one of the voting trustees to vote all of the stock represented by them at any company stockholders' meeting. Walter usually cast the vote on behalf of the other trustees. The voting trust agreement required that if a vacancy in the trusteeship occurred, the remaining trustee or trustees should appoint a successor. Successor trustees had to be officers of the company and would

180

have to secure the approval of the company's board of directors. However, neither the company's articles of incorporation nor its bylaws made any provision for the voting trust agreement.

Walter is still a voting trustee. On April 29, 1946, Ray Lucas was general counsel of the company and retained that office and the position of voting trustee until he retired on April 1, 1965. On April 29, 1946, J. L. Batchler was secretary of the company and subsequently became a vice president. He remained a voting trustee until April 2, 1964. As employees of the company, both Lucas and Batchler would report to Walter, the company's president.

The voting trust benefited the company's organization in that its agents and employees were assured that there would be a continuation of management; they were very pleased therefore when they learned of the voting trust agreement.

On April 30, 1946, certificates were issued under the voting trust agreement to the following individuals:

| Name | Number of units represented by certificates |
|---|---|
| Pearl | 8, 600 |
| Angeline | 9, 036 |
| Angeline and Walter, as trustees for Joseph Bixby | 429 |
| Angeline and Walter, as trustees for Walter Bixby, Jr | 429 |
| Joseph Bixby | 957 |
| Walter Bixby, Jr | 957 |
| Total | 20, 408 |

On November 31, 1951, the 429 certificates issued in trust for Joseph Bixby were transferred to the name of Joseph Bixby. On April 9, 1958, the 429 certificates issued in trust for Walter Bixby, Jr., were transferred to the name of Walter Bixby, Jr. The recipients of the certificates distributed on April 30, 1946, did not on that date own any other shares of company stock and did not thereafter acquire any company stock.

From April 30, 1946, through October 27, 1948, there were 20,408 outstanding units. On October 28, 1948, J. T. Allen of Denver, Colo., transferred to the voting trustees 150 shares of the company's common stock in exchange for certificates. On January 14, 1954, the trustees of the company's employees pension trust transferred to the voting trustees one share of the company's common stock in exchange for a certificate. As a result of these transfers the number of units in the voting trust was increased to 20,558 on October 28, 1948, and to 20,559 on January 14, 1954. Certificates representing 20,559 units remained outstanding from January 14, 1954, through January 3, 1963. The 20,408 shares of company stock exchanged for certificates on April 30, 1946, and the 151 shares of company stock later exchanged for voting

trust certificates constituted the only company shares that were exchanged for certificates.

From November 1947 through October 1961 Pearl and Angeline made various transfers of the certificates to their descendants and to the company's employees pension trust as follows:

| | Donors | | Donees | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pearl | Angeline | Joseph Bixby | Walter Bixby, Jr. | Kathryn Bixby | Nancy Bixby | Angeline I. Bixby | Robert Bixby | Walter Bixby III | Company pension trust |
| Units held as of Apr. 30, 1946 | 8,600 | 9,036 | 1,386 | 1,386 | | | | | | |
| **Item** / Date of transfers | | | | | | | | | | |
| 1¹ 11/18/47 | (1,100) | | 550 | 550 | | | | | | |
| 2 11/20/47 | | (60) | 30 | 30 | | | | | | |
| 3 12/29/48 | | (60) | 30 | 30 | | | | | | |
| 4¹ 12/29/48 | (60) | | 30 | 30 | | | | | | |
| 5 11/15/50 | | (60) | 30 | 30 | | | | | | |
| 6 12/23/52 | | (230) | 230 | | | | | | | |
| 7 10/14/53 | | (500) | 500 | | | | | | | |
| 8 12/29/53 | | (185) | 30 | 30 | 30 | 30 | 30 | 30 | | 5 |
| 9¹ 12/29/53 | (185) | | 30 | 30 | 30 | 30 | 30 | 30 | | 5 |
| 10 12/29/54 | | (96) | 48 | 48 | | | | | | |
| 11¹ 7/5/55 | (200) | | 100 | 100 | | | | | | |
| 12 12/30/58 | | (30) | 15 | 15 | | | | | | |
| 13 10/27/61 | | (1,060) | 500 | 500 | | | | | 60 | |
| 14¹ 10/27/61 | (1,000) | | 500 | 500 | | | | | | |
| Total inter vivos transfers | (2,545) | (2,281) | 2,623 | 1,893 | 60 | 60 | 60 | 60 | 60 | 10 |
| Total holdings as of 12/7/62 | 6,055 | 6,755 | 4,009 | 3,279 | 60 | 60 | 60 | 60 | 60 | 10 |

¹ Represents items transferred by Pearl; all other items were transferred by Angeline.

Except for items 1 and 7, Pearl and Angeline received no valuable consideration for any of the preceding transfers. With respect to item 1, Joseph Bixby on November 17, 1947, executed two documents entitled, respectively, "Note" and "Collateral Agreement" (hereinafter referred to as the 1947 note and the 1947 collateral agreement) in consideration of Pearl's transfer to him of 550 units. On the same day, Walter Bixby, Jr., executed two virtually identical documents in consideration of Pearl's transfer to him of an equal number of units. Joseph Bixby and Walter Bixby, Jr., each paid $5,000 to Pearl on November 20, 1947, as further consideration for transfer 1.

The two notes each had a face value of $50,000 and the only difference between them was in the name of the obligor. Each note was payable to the order of Pearl Reynolds in the sum of $50,000 to be paid in annual installment of $5,000 every September 1 from 1948 through 1957 "with interest at the rate of four percent per annum on each installment of $5,000.00 from maturity of each installment."

Each note further provided:

Demand for payment, protest, notice of dishonor, diligence and suit are hereby waived by the maker. Failure to pay any installment payment when due shall have the effect of automatically maturing, as of the date of default of the install-

ment falling due and unpaid, and all future installment payments of this note. Time of payment of any installment may be extended by the holder without notice to the maker.

The payment of this note is secured by the pledge of 550 units of Voting Trust Participation Certificates of Kansas City Life Insurance Company.

Writings on each note indicated that Joseph Bixby and Walter Bixby, Jr., had each repaid a total of $30,000 in yearly payments of $5,000 from 1948 through 1953. Neither of these promissory notes were reported in Pearl's estate tax returns.

The collateral agreements each provided that the obligor of the respective note pledged his 550 units to Pearl as security for payment of each note.

On November 17, 1947, all of the subscribers to the voting trust agreement executed a document entitled "Waiver and Consent" in which they consented and agreed to these transfers and to the concurrent pledge of the 1,100 units. The subscribers also waived whatever privilege of acquiring any portion of the 1,100 units that they may have had under article 10(a) of the voting trust agreement. The 1,100 units involved in item 1 were not offered for sale to the company's board of directors.

With respect to item 7, Joseph Bixby, on October 14, 1953, executed two documents entitled, respectively, "Note," and "Collateral Agreement" (hereinafter referred to as the 1953 note and 1953 collateral agreement) in consideration of Angeline's transfer to him of 500 units. The face value of the 1953 note was $50,000 and it was similar to the 1947 note except that Angeline was the obligee and the yearly installments were payable over a period of 15 years from 1954 through 1968. The 1953 collateral agreement was similar to the 1947 collateral agreement in that Joseph Bixby pledged the 500 units to Angeline as security for the payment of the 1953 note.

Writings on the 1953 note indicated that a total of $27,000 had been repaid up to Angeline's death.

On October 14, 1953, all of the subscribers to the voting trust agreement executed a document entitled "Waiver and Consent" in which they consented and agreed to the transfer in item 7 and the concurrent pledge of the 500 units. This waiver and consent was similar to the waiver and consent of November 17, 1947, in that the subscribers waived whatever privilege of acquiring any portion of the 500 units that they may have had under article 10(a) of the voting trust agreement. The certificates involved in item 7 were not offered for sale to the company's board of directors.

From time to time, Walter, as executor of the estates of Pearl and Angeline, filed with the Probate Court of Jackson County, Mo., petitions for authority to pay for professional services with respect to the valuation of the certificates held by each estate. He did not petition-

the Probate Court for approval of extension of the voting trust agreement. Neither estate has sold any certificates.

At all the valuation dates in issue, the capital of the company comprised 40,000 shares of common stock of $100 par value per share. The company's common stock was not listed on any stock exchange. However, the stock was bought and sold through brokers on the over-the-counter market. During the 5-year period ended December 31, 1962, 14,035 shares of the company's common stock were purchased on the market in 2,726 transactions in lots as follows:

| | Number of purchases | Number of shares |
|---|---|---|
| Lots of 5 shares or less | 2, 246 | 4, 863 |
| Over 5 shares but not over 10 shares | 297 | 2, 670 |
| Over 10 shares but not over 25 shares | 122 | 2, 011 |
| Over 25 shares but not over 100 shares | 54 | 2, 429 |
| Over 100 shares | 7 | 2, 062 |
| Total | 2, 726 | 14, 035 |

With respect to the transfer dates of items 1 through 14 and the dates of death of Pearl and Angeline the following table shows the formula price, the mean over-the-counter price for company stock not restricted by the voting trust agreement, and the authorized dividends per share for the year in which the transfers occurred:

| Item | Date of transfers | Formula price | Mean over-the-counter quotation | Dividend in year of transfers |
|---|---|---|---|---|
| 1 | Nov. 18, 1947 | $100. 00 | $210. 00 | $4 |
| 2 | Nov. 20, 1947 | 100. 00 | 210. 00 | 4 |
| 3 | Dec. 29, 1948 | 100. 00 | 185. 00 | 4 |
| 4 | Dec. 29, 1948 | 100. 00 | 185. 00 | 4 |
| 5 | Nov. 15, 1950 | 100. 00 | 165. 00 | 4 |
| 6 | Dec. 23, 1952 | 100. 00 | 460. 00 | 4 |
| 7 | Oct. 14, 1953 | 100. 00 | 568. 00 | 4 |
| 8 | Dec. 29, 1953 | 100. 00 | 665. 00 | 4 |
| 9 | Dec. 29, 1953 | 100. 00 | 665. 00 | 5 |
| 10 | Dec. 29, 1954 | 108. 33 | 1, 115. 00 | 5 |
| 11 | July 5, 1955 | 108. 33 | | 8 |
| 12 | Dec. 30, 1958 | 183. 33 | 1, 620. 00 | 4 |
| 13 | Oct. 27, 1961 | 283. 33 | 2, 540. 00 | 14 |
| 14 | Oct. 27, 1961 | 283. 33 | 2, 540. 00 | 14 |
| Death of Pearl | Dec. 7, 1962 | 316. 67 | 2, 637. 50 | 14 |
| Death of Angeline | Jan. 3, 1963 | 316. 67 | 330. 00 | 14 |

The ranges of prices at which the unrestricted company shares sold on the over-the-counter market from 1946 through 1962 and the year-end formula price for each of those years were as follows (amounts in dollars):

| | Range of prices | Yearend formula price | | Range of prices | Yearend formula price |
|---|---|---|---|---|---|
| 1946 | 200–262. 50 | 100 | 1955 | 1110–1950 | 116. 67 |
| 1947 | 200–235 | 100 | 1956 | 1110–1575 | 133. 33 |
| 1948 | 181. 25–225 | 100 | 1957 | 1030–1540 | 158. 33 |
| 1949 | 150–198 | 100 | 1958 | 1060–1730 | 183. 33 |
| 1950 | 150–190 | 100 | 1959 | 1395–1700 | 216. 67 |
| 1951 | 175–195 | 100 | 1960 | 1200–1485 | 233. 33 |
| 1952 | 200–500 | 100 | 1961 | 1265–3300 | 283. 33 |
| 1953 | 450–680 | 100 | 1962 | 2000–3450 | 316. 67 |
| 1954 | 655–1115 | 108. 33 | | | |

Following is the company's balance sheet as of December 31, 1962:

BALANCE SHEET OF KANSAS CITY LIFE INSURANCE COMPANY
December 31, 1962

*Assets*

| | |
|---|---:|
| Cash in banks | $2, 200, 900. 14 |
| Bonds: | |
|     Federal Government—direct or fully guaranteed obligations | 65, 513, 620. 08 |
|     State, county, municipal and school | 52, 929, 776. 04 |
|     Public utility and corporate | 54, 075, 856. 76 |
| Preferred stocks | 3, 441, 381. 23 |
| First-mortgage real estate loans: | |
|     On farm properties | 70, 925, 185. 10 |
|     On city properties | 62, 691, 227. 09 |
|     F.H.A. loans on city properties (insured and guaranteed by U.S. Government) | 61, 945, 977. 04 |
| Real estate owned: | |
|     Property, including home office, occupied by company in conduct of its business.  $3, 276, 000. 00 | |
|     Income property purchased  15, 702, 128. 09 | |
|     Under contract of sale  128, 547. 07 | 19, 106, 675. 16 |
| Accrued interest on investments | 5, 318, 796. 30 |
| Loans on policies and secured by their cash values | 29, 725, 491. 23 |
| Premiums due in 1962 with payment deferred to 1963 | 8, 424, 906. 80 |
| Total assets | 436, 299, 792. 97 |

*Liabilities*

| | |
|---|---:|
| Total funds required for all payments to be made under outstanding policies after date of this statement on account of premiums to said date (cash values of all outstanding policies are included in this amount) | $380, 457, 836. 08 |
| Balance of taxes on business of 1962 payable in 1963 | 2, 259, 370. 00 |
| All other obligations accrued but not yet due | 1, 602, 475. 30 |
| Amount reserved for possible reduction in asset values, including amount determined by insurance departments of the State of Missouri and other States in which the company operates | 1, 610, 000. 00 |
| Company's capital | 4, 000, 000. 00 |
| Special contingency fund | 5, 000, 000. 00 |
| Unassigned surplus | 41, 370, 111. 59 |
| Total liabilities | 436, 299, 792. 97 |

During the 20 years from 1943 through 1962 the company had insurance in force, increases in insurance in force, book value, and net gains from operations as follows (all dollar amounts are in millions):

## INSURANCE IN FORCE

| Year end | Ordinary life | Term | Other | Total | Increases over previous years | Percent | Book value | Net gains (or loss) from operations |
|---|---|---|---|---|---|---|---|---|
| 1943 | $487 | $40 | 2. 0 | $529 | | | $8. 3 | $0. 89 |
| 1944 | 518 | 35 | 2. 0 | 555 | 26 | 4. 9 | 8. 8 | 0. 38 |
| 1945 | 574 | 33 | 2. 0 | 609 | 54 | 9. 7 | 9. 30 | (0. 79) |
| 1946 | 635 | 37 | 1. 6 | 674 | 65 | 10. 7 | 10. 01 | 0. 93 |
| 1947 | 689 | 41 | 1. 5 | 732 | 58 | 8. 6 | 10. 53 | 0. 76 |
| 1948 | 721 | 51 | 1. 5 | 774 | 42 | 6. 7 | 11. 15 | 1. 51 |
| 1949 | 738 | 61 | 1. 5 | 801 | 27 | 3. 5 | 11. 97 | 2. 15 |
| 1950 | 770 | 82 | 1. 3 | 853 | 52 | 6. 5 | 13. 90 | 2. 75 |
| 1951 | 796 | 94 | 1. 2 | 891 | 38 | 4. 3 | 15. 84 | 2. 71 |
| 1952 | 839 | 115 | 1. 2 | 955 | 64 | 7. 2 | 18. 50 | 3. 17 |
| 1953 | 880 | 133 | 1. 1 | 1, 014 | 59 | 6. 2 | 21. 22 | 3. 25 |
| 1954 | 904 | 150 | 1. 0 | 1, 055 | 41 | 4. 0 | 24. 59 | 3. 87 |
| 1955 | 947 | 170 | 1. 0 | 1, 118 | 63 | 6. 0 | 27. 74 | 3. 46 |
| 1956 | 991 | 197 | 0. 9 | 1, 188 | 70 | 6. 3 | 30. 99 | 3. 75 |
| 1957 | 1, 049 | 211 | 0. 8 | 1, 261 | 73 | 6. 2 | 34. 21 | 3. 81 |
| 1958 | 1, 098 | 221 | 0. 7 | 1, 320 | 59 | 4. 7 | 37. 45 | 3. 84 |
| 1959 | 1, 141 | 231 | 0. 7 | 1, 373 | 53 | 4. 0 | 39. 49 | 4. 08 |
| 1960 | 1, 174 | 253 | 0. 7 | 1, 428 | 55 | 3. 9 | 42. 84 | 4. 55 |
| 1961 | 1, 204 | 267 | 0. 7 | 1, 472 | 44 | 3. 1 | 46. 43 | 4. 11 |
| 1962 | 1, 230 | 290 | 0. 6 | 1, 521 | 49 | 3. 3 | 50. 37 | 4. 57 |

Of the $1,520,712,000 of insurance in force as of December 31, 1962, $193,278,386 consisted of participating insurance and $1,327,433,614 consisted of nonparticipating insurance.

During the 10 years ended December 31, 1962, the company's premium income, net investment income, rate of net interest earned, lapse ratio of policies written, average premium income on policies of ordinary life insurance, average premium income on all business including term insurance, average face amount of outstanding policies, net gain from operations per share, and net book value per share were as follows (all figures are in dollars except net interest earned and lapse ratio):

| Year | Premium income | Net investment income | Net interest earned | Lapse ratio | Average premium income | | Average policy amount | Net gain for operations per share | Net book value per share |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Ordinary | All business | | | |
| | | | Percent | Percent | | | | | |
| 1953 | $125, 786, 000 | $9, 538, 000 | 3. 55 | 5. 5 | $26. 18 | $27. 37 | $2, 537 | $81. 32 | $530. 40 |
| 1954 | 113, 747, 000 | 10, 351, 000 | 3. 62 | 5. 6 | 26. 04 | 27. 22 | 2, 437 | 96. 74 | 614. 69 |
| 1955 | 150, 519, 000 | 11, 196, 000 | 3. 60 | 6. 6 | 25. 55 | 26. 75 | 2, 539 | 86. 53 | 693. 51 |
| 1956 | 153, 004, 000 | 11, 938, 000 | 3. 74 | 5. 7 | 24. 75 | 26. 03 | 2, 656 | 93. 85 | 774. 84 |
| 1957 | 169, 810, 000 | 12, 496, 000 | 3. 72 | 6. 4 | 23. 93 | 24. 91 | 2, 774 | 95. 17 | 855. 19 |
| 1958 | 161, 550, 000 | 13, 300, 000 | 3. 78 | 6. 3 | 23. 53 | 24. 46 | 2, 852 | 95. 94 | 936. 20 |
| 1959 | 163, 340, 000 | 14, 481, 000 | 3. 94 | 6. 6 | 23. 10 | 24. 02 | 2, 939 | 102. 08 | 987. 20 |
| 1960 | 176, 509, 000 | 15, 288, 000 | 4. 00 | 7. 1 | 22. 54 | 23. 41 | 3, 040 | 113. 97 | 1, 070. 88 |
| 1961 | 173, 975, 000 | 16, 507, 000 | 4. 16 | 7. 3 | 22. 03 | 22. 91 | 3, 130 | 102. 63 | 1, 160. 84 |
| 1962 | 174, 709, 000 | 17, 070, 000 | 4. 15] | 6. 9 | 21. 54 | 22. 39 | 3, 237 | 114. 24 | 1, 259. 25 |

On April 21, 1961, Pearl made cash gifts (which she did not report on any of her Federal gift tax returns) as follows:

| Donee | Amount | Donee | Amount |
|---|---|---|---|
| Angeline | $3, 000 | Walter Bixby, Jr | $3, 000 |
| Walter | 3, 000 | Mrs. Joseph Bixby | 3, 000 |
| Joseph Bixby | 3, 000 | Mrs. Walter Bixby, Jr | 3, 000 |

In all of the gift tax returns and in the estate tax returns the value of the certificates transferred was reported solely on the basis of the formula price.

Respondent determined that the certificates should have been valued at the over-the-counter prices for small-lot sales of the underlying shares. The value of each of items 1 through 14 is in issue except that the determination of the taxability of item 11 is barred by the statute of limitations. The values of transfers 6 and 10 are at issue for the limited purpose of determining the value of total gifts in later years.

OPINION

The principal issue we must decide is whether respondent erred in valuing certain voting trust certificates at the value of the shares of common stock underlying the certificates. In question is the valuation of certificates conveyed in 37 transfers of which 35 were inter vivos transfers and 2 were transfers at the deaths of Pearl and Angeline. The following table shows the dates of the transfers, the transferor, the total number of units transferred, and the percentage that these units represented with respect to the total number of units outstanding:

| Item[a] | Date | Transferor | Number of units | Percentage of units |
|---|---|---|---|---|
| 1 | Nov. 18, 1947 | Pearl | 1,100 | 5.34 |
| 2 | Nov. 20, 1947 | Angeline | 60 | 0.29 |
| 3 | Dec. 29, 1948 | Angeline | 60 | 0.29 |
| 4 | Dec. 29, 1948 | Pearl | 60 | 0.29 |
| 5 | Nov. 15, 1950 | Angeline | 60 | 0.29 |
| 6 | Dec. 23, 1952 | Angeline | 230 | 1.11 |
| 7 | Oct. 14, 1953 | Angeline | 500 | 2.43 |
| 8 | Dec. 29, 1953 | Angeline | 185 | 0.90 |
| 9 | Dec. 29, 1953 | Pearl | 185 | 0.90 |
| 10 | Dec. 29, 1954 | Angeline | 96 | 0.47 |
| 12 | Dec. 30, 1958 | Angeline | 30 | 0.15 |
| 13 | Oct. 27, 1961 | Angeline | 1,060 | 5.15 |
| 14 | Oct. 27, 1961 | Pearl | 1,000 | 4.85 |
| Pearl's death | Dec. 7, 1962 | Pearl | 6,055 | 29.45 |
| Angeline's death | Jan. 3, 1963 | Angeline | 6,755 | 32.86 |

All of the inter vivos transfers were outright gifts except that with respect to items 1 and 7 Pearl and Angeline received cash and promissory notes as consideration for the transfers.

The certificates we must value are highly unusual securities. They were issued in 1946 pursuant to a voting trust agreement entered into by the Reynolds-Bixby family for the purpose of perpetuating the company's management and policy. In 1946 the Reynolds-Bixby family owned slightly more than 50 percent of the company's common stock; they placed all of that stock in the voting trust. Although the company's stock was traded on the over-the-counter market, the

---

[a] Item 11 is not in dispute because the statute of limitations for that transfer has expired. Also, it should be noted that for simplicity of presentation items 1–5, 8–10, and 12–14 each represent transfers to two or more donees. However, our ultimate findings of value reflect the aggregate of the values of *each* gift. In any event, in no instance did we find that the aggregate of the values of each transfer differed from the value of each item taken as a whole.

facts that the company was so closely held, and the market in the stock so "thin," would have presented quite enough difficulty were we evaluating only the unrestricted shares of the company's stock. Our task is further complicated because the instruments we must value are not shares of common stock, but are voting trust certificates which, in essence, represent shares of common stock stripped, *inter alia*, of all voting rights.

The valuation vista is doubly obscured because the voting trust agreement imposes severe restrictions upon the certificates' alienability. A certificate holder wishing to sell his certificates had to first offer the certificates at a formula price to the other certificate holders. If the other certificate holders refused the offer, then a second offer had to be made (at the same formula price) to the company's board of directors.[7] For the valuation dates in question the formula price was always less than the over-the-counter market price of the unrestricted shares. Only if both preferred groups of offerees refused to accept the respective offers might the prospective seller look to outside purchasers.

Section 2031(a) provides that:

The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, * * *

Hence, the value of the certificates that Pearl and Angeline owned at their deaths would be included in their respective gross estates by virtue of section 2033.[8] Similarly, section 2501(a)(1), like its predecessor, section 1000(a) of the 1939 Code, imposes a tax upon transfers of property by gift and section 2512, like its predecessors, section 1002 and 1005 of the 1939 Code, provides for valuation of gifts as follows:

SEC. 2512. VALUATION OF GIFTS.

(a) If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift.

(b) Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed

---

[7] Respondent urges that the fact that the units were not offered to the company's board of directors with respect to the purported sales to Joseph Bixby and Walter Bixby, Jr., in 1947 and 1953 demonstrates "the laxity under which the Voting Trust Agreement was administered" and "that the preemption provisions are nothing more than an attempt to artificially depress the stock for tax valuation purposes." However, art. 10(a) of the voting trust agreement is, at best, ambiguous on this point. We are inclined to read the language of that article as allowing sales of the units between certificate holders without imposing the additional requirement of offering the units at the formula price to the company's board of directors.

[8] SEC. 2033. PROPERTY IN WHICH THE DECEDENT HAD AN INTEREST.

The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death.

a gift, and shall be included in computing the amount of gifts made during the calendar year.

Except for the availability of allowable exclusions and deductions, items 1-10 and items 12-14 were subject to the gift tax under the 1939 Code and the 1954 Code, respectively. See secs. 7851(b)(1) and 7851(a)(2)(B).

The term "value" is used frequently in the estate and gift provisions of the Internal Revenue Code. E.g., secs. 2031-2043, 2512. Not surprisingly it is a nebulous term. The statute does not define "value" but the regulations under section 2031 elucidate this term by equating it to "fair market value" which in turn is defined as (sec. 20.2031-1(b), Estate Tax Regs.):

the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.

The relevant Gift Tax Regulations provide a virtually identical definition. Sec. 25.2512-1, Gift Tax Regs.; sec. 86.19(a), Regs. 108.

On their gift and estate tax returns petitioners reported the fair market value of the certificates by relying solely on the formula price. Indeed, two early estate valuation cases in the Second Circuit lend support to the proposition that the fair market value of securities restricted by first-offer provisions is limited to the preemption price fixed by those provisions. *Lomb* v. *Sugden*, 82 F. 2d 166 (C.A. 2, 1936); *Wilson* v. *Bowers*, 57 F. 2d 682 (C.A. 2, 1932). In the *Wilson* case the court found that "the suggestion that the shares may have had a greater market value because of the possibility that the options would not be exercised seems too extravagant to require further refutation" and that, therefore, "the property could not be sold for more than the option price." 57 F. 2d at 684. The Second Circuit's approach indicates an untoward reliance on valuation from the point of view of a sale; it gives little or no weight to "retention" value, or to the price a potential willing buyer would offer for the securities, restricted though they were. Four years later, the Second Circuit held that the very similar facts in *Lomb* were governed by *Wilson* and also by the contemporaneous case of *Helvering* v. *Salvage*, 297 U.S. 106 (1936), which involved the valuation for income tax purposes of encumbered corporate stock. But see Note, "Valuation of Stock Subject to Restrictive Agreement for Federal Estate and Gift Taxation," 60 Harv. L. Rev. 123, 131 (1946) (questioning application of income valuation cases as precedent in estate and gift valuation cases).

The courts in the Second Circuit seem to continue to hold to the view that first-offer restrictions on the sale of securities are the sole

index of the securities' fair market value, at least where the restrictions are enforceable both at death and during the security holder's lifetime. *Slocum* v. *United States*, 256 F. Supp. 754 (S.D.N.Y. 1966) ; see *May* v. *McGowan*, 194 F. 2d 396 (C.A. 2, 1952) ; but see *James* v. *Commissioner*, 148 F. 2d 236 (C.A. 2, 1945), affirming 3 T.C. 1260 (1944) ; *Commissioner* v. *McCann*, 146 F. 2d 385, 386 (C.A. 2, 1944), reversing 2 T.C. 702 (1943) ; *Mathews* v. *United States*, 226 F. Supp. 1003, 1008 (E.D.N.Y. 1964). However, early rulings by the Board of Tax Appeals (a predecessor of this Court) and later rulings by various tribunals which have attempted to distinguish *Wilson* and *Lomb* make it clear that the existence of first-offer provisions is usually no more than a relevant factor to be considered with all other factors in determining fair market value. E.g., *Krauss* v. *United States*, 140 F. 2d 510, 511 (C.A. 5, 1944) ; *Charles T. Kline*, 44 B.T.A. 1052, 1056 (1941), affd. 130 F. 2d 742 (C.A. 3, 1942), certiorari denied 317 U.S. 697 (1943) ; *Michigan Trust Co. et al., Executors*, 27 B.T.A. 556, 561 (1933) ; *City Bank Farmers Trust Co., Executor*, 23 B.T.A. 663, 669 (1931) ; Rev. Rul. 189, 1953–2 C.B. 294.

In particular, first-offer provisions have been held to be only a factor where the security was gifted without becoming subject to the first-offer provisions, *Spitzer* v. *Commissioner*, 153 F. 2d 967, 971 (C.A. 8, 1946), affirming a Memorandum Opinion of this Court; where the first-offer provisions became effective only upon the death of the security holder who was free to dispose of the security by sale or gift up until death, *Estate of James H. Matthews*, 3 T.C. 525, 528 (1944) ; Rev. Rul. 59–60, 1959–1 C.B. 244; where the transferor was not, by reason of the first-offer provisions, obligated to sell unless he desired to sell, *Halsted James*, 3 T.C. 1260, 1264 (1944), affd. 148 F. 2d 236 (C.A. 2, 1945) ; where there was no showing that the transferor desired to sell, *Frederick A. Koch, Jr., Executor*, 28 B.T.A. 363, 366 (1933) ; or where there was no showing that the first offerees would have exercised their right of preemption, compare *Estate of Louise N. Schulz*, 14 B.T.A. 419, 420 (1928), with *Estate of Albert L. Salt*, 17 T.C. 92, 99 (1951), and Rev. Rul. 54–76, 1954–1 C.B. 194.[9]

In the instant case the certificates could be freely gifted or devised although in the hands of the donee or devisee they would remain

---

[9] Similar doctrines emerge in those cases involving the estate valuation of partnership interests subject to so-called buy-and-sell agreements. Thus, where the estate of a deceased partner was obligated to offer the decedent's interest to the surviving partners and where the surviving partners were obligated to buy that interest at a predetermined price based solely on book value, the predetermined price was held to be the proper one for estate valuation purposes. *Brodrick* v. *Gore*, 224 F. 2d 892, 896 (C.A. 10, 1955) ; *Estate of Lionel Weil*, 22 T.C. 1267, 1275 (1954). But where the surviving partners were not obligated to purchase the decedent's interest a similar restrictive agreement was held to be only a factor in ascertaining the fair market value of the decedent's interest. *United States* v. *Land*, 303 F. 2d 170, 174–175 (C.A. 5, 1962), certiorari denied 371 U.S. 862 (1962).

subject to the preemption provisions. Furthermore, petitioners themselves have shown that neither Pearl nor Angeline intended to sell the certificates. Similarly, no independent event could trigger the preemption provisions. Only if one of the certificate holders desired to sell his beneficial interest in the company would the preemption provisions become operative. Finally, although petitioners intimated that in the event that Pearl or Angeline attempted to sell any of their certificates the other certificate holders and the company would quickly exercise their first-offer options, that intimation is not adequately supported by the record.

One rationale for rejecting the formula price as the absolute determinative of fair market value is that such a figure does not represent the value of all of the rights inherent in the ownership of a certificate. Thus, the Supreme Court has held that the fair market value for gift purposes of a fully paid life insurance policy was the cost of that policy and not merely its cash surrender value because the right to surrender the policy was only one of the "substantial legal incidents of ownership." *Guggenheim* v. *Rasquin*, 312 U.S. 254, 257 (1941). The policyholder also had "the right to retain it for its investment virtues and to receive the face amount of the policy upon the insured's death." 312 U.S. at 257. See also *Collins* v. *Commissioner*, 216 F. 2d 519 (C.A. 1, 1954), affirming *Estate of Mary Gowdy*, 21 T.C. 219 (1953) (estate value of defense and savings bonds held to be par value and not redemption value). Consequently, the so-called "retention value" of voting trust certificates whose transferability has been restricted has been recognized as constituting an important criterion in determining the fair market value of such securities for gift and estate valuation purposes. *Baltimore National Bank* v. *United States*, 136 F. Supp. 642, 653 (D. Md. 1955).

In the present case it is true that, for a period of time dependent upon the date of the voting trust's ultimate termination, a certificate holder was denied two of the most important indicia of security ownership, viz, the right to vote and the right of unrestricted transfer. See *Frederick A. Koch, Jr., Executor, supra* at 365. However, a certificate holder still held other important ownership privileges which constituted his multipartite parcel of rights. He retained the right to receive dividends subject to the never-exercised privilege of the trustees to deduct administrative expenses from the dividends. See *Raymond J. Moore*, 3 T.C. 1205, 1211 (1944). Also, upon termination of the voting trust the certificate holders were entitled to recover the unrestricted shares that they had originally deposited. Furthermore, in case of liquidation or mutualization the certificate holders would presumably be entitled to recapture the equitable value of the shares underlying

the certificates. And, of course, as petitioners themselves have so strongly urged, the certificate holders were possessed of the knowledge that the certificates represented an investment which was protected by the voting trustees' experienced and stabilizing influence upon the company's management and policies. Finally, any possible long-term appreciation of certificates or the underlying shares would inure to the benefit of the certificate holders. Cf. *Guggenheim* v. *Rasquin*, *supra* at 257.

In light of these facts, we conclude that the restrictive provisions of the voting trust agreement are at most a factor to be considered in evaluating the certificates.

Respondent would go one step further and completely ignore the voting and transfer restrictions in valuing the certificates. In terming this a case of "the disappearing wealth" he figuratively registers his opinion that the voting trust agreement did not appreciably affect the value of the investment which the members of the Reynolds-Bixby family had in the company. In effect he urges that the value of the certificates was the same as the value of an equal number of free shares that the certificates represented. His principal contention is that in order to make free stock available to any potential willing buyer, the voting trust agreement could easily have been terminated by: (1) the voting trustees, (2) all the certificate holders acting in concert, (3) normal expiration in 1966, or (4) by an adversary proceeding under Missouri law.

By its own terms the voting trust agreement could be terminated by a majority of the voting trustees with the consent of the company but the mere possibility of such action is not enough to render it a certainty which would completely negate the effect of the voting trust agreement. The interrelations among the company, the Reynolds-Bixby family and the voting trustees were extremely complex. All of the voting trustees were officers of the company and yet as voting trustees they controlled the selection of the company's board of directors who in turn presumably controlled the selection of the company's officers. See Mo. Ann. Stat. sec. 375.181 (1968). At the relevant valuation dates Walter was the only voting trustee who was also a member of the Reynolds-Bixby family. The other two voting trustees could, if they desired, overrule any of the wishes transmitted by the family through Walter to the voting trust. While no instance of independent judgment on the part of the nonfamily voting trustees was in evidence, we may infer from the company's smooth growth that none of the voting trustees had occasion to exercise individual judgment. Therefore, if Walter, hoping to enhance the value of the estates' investment, had requested the other voting trustees to terminate the voting trust in

order to free the underlying shares, we believe that the voting trustees would be bound by their trust to weigh such action in light of its effect on the purposes of the voting trust. Their fiduciary responsibilities to the other certificate holders and to the company's well-being (not their allegiance to Walter in his capacity as representative of the estates' interests) would dictate their conduct.

A voting trust like any other trust could be terminated by unanimous action of all the grantors and beneficiaries. Restatement, Trusts 2d, sec. 338 (1959); [10] 4 Scott, Trusts 338 (3d ed. 1967); see *Stephens* v. *Moore*, 298 Mo. 215, 226, 249 S.W. 601, 603 (1923). From a review of the company's steady growth, participation in the voting trust was probably a benefit and certainly could not be considered a detriment to those certificate holders whose investment was being overseen by the voting trustee. Therefore, a reasonable and willing buyer viewing the facts and circumstances surrounding the voting trust would expect that the certificate holders would desire to continue having their investment safely overseen by the voting trustees. Even assuming that all the participating members of the Reynolds-Bixby family would, out of familial loyalty, act to terminate the trust (and this proposition is far from clear), a reasonable buyer could not make the same assumption with respect to the voting trust interests held by J. T. Allen and the company's employees pension trust.

For similar reasons it would have been in the certificate holders' best economic interests to renew the voting trust in 1966. However, respondent argues that since the voting trust could be renewed only by a two-thirds vote of all the certificate holders, an outside party, having purchased from Angeline's estate 32.86 percent of the total units in the voting trust (or from Pearl's estate 29.45 percent of all the units in the voting trust) could, by purchasing free stock on the over-the-counter market and depositing it in the voting trust, block the renewal of the voting trust. This assumes that the Reynolds-Bixby family would not also attempt to make similar purchases to insure the renewal of the voting trust by a two-thirds vote. In any event, the possibility of such power struggles is one more factor that we have considered.

A voting trust is valid under Missouri law. Mo. Ann. Stat. sec. 351.246 (1966); see *Jesser* v. *Mayfair Hotel*, 316 S.W. 2d 465 (Mo.

[10] Secs. 338 and 340 of the Second Restatement of Trusts would also allow termination of a trust if some of the beneficiaries did not consent so long as the nonconsenting beneficiaries' interests are not prejudiced by the termination. Since, in the instant case, the purpose of the voting trust was to consolidate the voting power of stock constituting a bare majority of all the company stock outstanding, termination would definitely prejudice the interests of any nonconsenting beneficiaries.

1958.)[11] Respondent does not contend otherwise but does argue that the preemption provisions of the voting trust agreement constituted an unreasonable restraint of alienation of the certificates. If respondent's contention is correct, then any certificate holder could have sold his certificates without restriction and, in an adversary proceeding, could have forced the voting trustees to effect a transfer on the voting trust's books. Indeed, if the preemption provisions are invalid, and at the same time constitute an integral part of the voting trust agreement, it is likely that the entire voting trust agreement would be invalid. See *Tracey* v. *Franklin*, 31 Del. Ch. 477, 67 A. 2d 56 (1949).

Respondent relies on two Missouri decisions, *Kershner* v. *Hurlburt*, 277 S.W. 2d 619 (Mo. 1955), and *Missouri State Highway Commission* v. *Stone*, 311 S.W. 2d 588 (Mo. Ct. App. 1958), which held invalid certain first-offer restrictions on the sale of real property. While those cases may provide insight as to the criteria which bear on the reasonableness of restraints on alienation, they deal solely with restraints on real estate and do not mention restraints on corporate securities.

With respect to restraints on the alienation of corporate securities, the Missouri Supreme Court has upheld the validity of corporate charter provisions which required the corporation's stockholders to first offer the corporation's stock to the corporation at par value before attempting to sell to others. *State* v. *Sho-me Power Co-operative*, 356 Mo. 832, 204 S.W. 2d 276 (1947). The court also cited approvingly *Doss* v. *Yingling*, 95 Ind. App. 494, 172 N.E. 801 (1930), where similar first-offer provisions setting the preemption price at book value were found to be reasonable. Thus, under Missouri law it would be doubtful that first-offer provisions which limited the sale of corporate stock to a preemption price set at 25 times dividends would be unreasonable restraints on alienation. The fact that the certificates herein represented shares of common voting stock stripped of the voting right rather than the actual shares themselves should not alter this conclusion. If, as in the instant case, a prospective purchaser had notice of the restrictions,[12] they would most likely be valid. Compare

---

[11] In fact Missouri has one of the nation's most liberal voting trust statutes. Sec. 351.246 of the Annotated Missouri Statutes states:

"Any number of shareholders of a corporation may create a voting trust for the purpose of conferring upon a trustee or trustees the right to vote or otherwise represent their shares, for any period, without regard to the rule against perpetuities or similar rules."

Although this provision was added in 1965 (subsequent to all the valuation dates in question here), the *Jesser* case and the comment appended to the statute indicate that the statute is merely a codification of preexisting Missouri law.

[12] The certificates clearly stated on their face that their sale or transfer was restricted by articles 9 and 10 of the voting trust agreement.

*State* v. *Sho-me Power Co-operative*, *supra*, and *State* v. *Druggists'
Addressing Co.*, 113 S.W. 2d 1061 (Mo. Ct. App. 1938), with *Brinker-
hoff-Farris Trust and Savings Co.* v. *Home Lumber Co.*, 118 Mo. 447,
24 S.W. 129 (1893).

The possibility of an early termination of the voting trust is not so
certain or even so probable that a reasonable, potential investor could
ignore the restrictions imposed by the voting trust agreement. There-
fore, we cannot say, as respondent contends, that such an individual
would entirely disregard the voting trust agreement. He would know
that at best, he was "buying a fight."

Respondent also argues that we should disregard the preemption
provisions of the voting trust agreement because they represent a tax
device and are testamentary in nature. If, indeed, the preemption pro-
visions constituted a device to pass the certificates held by Pearl and
Angeline "to the natural objects of * * * [their] bounty for less than
an adequate and full consideration in money or money's worth" or if
they did not represent "a bona fide business arrangement," then we
might be obliged to accept respondent's argument. See sec. 20.2031-2
(h), Estate Tax Regs.; *Estate of Orville B. Littick*, 31 T.C. 181, 186
(1958); *Edith M. Bensel et al., Executors*, 36 B.T.A. 246, 252 (1937),
affd. 100 F. 2d 639 (C.A. 3, 1938). We are, however, satisfied that the
Reynolds-Bixby family entered into the voting trust agreement in
1946 with the principal purpose of assuring the continuity of the
company's management and policies. We should note that at the time
of the creation of the voting trust, the formula price was much nearer
the prevalent over-the-counter market price of the free stock than it
was in later years. In April 1946 the unrestricted stock sold at $250
per share and for 6 years from 1946 through 1951 the purchase price
fluctuated between $150 and $262.50 per share while the formula price
during that period was $100 per unit. Thus, the market price of an
unrestricted share ranged from approximately one and one-half to
two and one-half times the formula price. The fact that in 1952 the
general rise in securities' prices, and the rise in price for this unre-
stricted stock, raised this market-price-to-formula-price ratio to 10 to
1 by 1962 could not have been predicted in 1946. Therefore, the large
discrepancy between market price per unrestricted share and formula
price per unit was not the result of any cleverly devised plan to lower
the testamentary value of Pearl's and Angeline's respective invest-
ments in the company.

Respondent's arguments do not convince us that the voting trust
agreement should be completely disregarded in ascertaining the fair
market value of the transfers involved herein. The voting trust agree-
ment is very definitely a factor we must consider in arriving at the
value of the certificates.

Petitioners, by conceding that—

with particular reference to restrictive agreements, we have found no decision holding that a restriction upon the sale of stock without first offering it to others at an agreed price, without a binding obligation to sell would limit the fair market value of the restricted stock to such agreed price for the purposes of estate or gift taxes * * *

admit that the provisions restricting transfer of the certificates cannot be more than a factor in determining the fair market value of the certificates involved herein. But petitioner points out the apparent inconsistency of valuing property at a price greater than could be realized upon sale. In particular, he draws analogy to the facts in *Davis* v. *United States*, 306 F. Supp. 949 (C.D. Cal. 1969). In that case, the fair market value for estate tax purposes of mutual fund stock was held to be the redemption price at which the mutual fund guaranteed to repurchase its stock even though the fund's operating price to the public was greater than the redemption price by an amount based upon a sales commission charge. Contra, sec. 20.2031–8(b), Estate Tax Regs.; sec. 25.2512–6(b), Gift Tax Regs.; *Howell* v. *United States*, 414 F. 2d 45 (C.A. 7, 1969); *Estate of Frances Foster Wells*, 50 T.C. 871 (1968), affirmed sub nom. *Ruehlmann* v. *Commissioner*, 418 F. 2d 1302 (C.A. 6, 1969), certiorari denied 398 U.S. 950 (1970).

What may underlie both the conflict among the *Davis*, *Howell*, and *Wells* cases and the conflict between petitioners and respondent in this case is an uneasiness in the application of the specific terms of the "fair market value" prescription. "Fair market value" is not an incantation whose ritualistic use will immediately reveal the worth of unusual types of property. The basis of the definition of fair market value is the assumption that hypothetical willing buyer and hypothetical willing seller, neither being under compulsion to buy or sell and both having reasonable knowledge of the relevant facts, will arrive at some sale price for the property in question. Sec. 20.2031–1 (b), Estate Tax Regs.; sec. 25.2512–1, Gift Tax Regs. In reality, no willing buyers or willing sellers may exist. In the instant case, a further logical inconsistency arises where a willing buyer might offer to pay much more than the formula price for the certificates and a willing seller would clearly accept much more than the formula price, but the existence of the restrictions permits a third party to preempt at the formula price. This plight does not relieve us of the duty to evaluate the certificates involved herein.[13]

Most of the trial was devoted to the opinion testimony of four valuation experts upon whose experienced guidance we have placed

---

[13] The abstract nature of the valuation exercise we must perform has led one commentator to say:

"The valuation of property subject to restrictions upon sale or other alienation involves for the purposes of federal income, gift, or estate taxation both a contradiction in terms and a physical impossibility. * * *"
Molloy, "Restraints on Alienation and the Internal Revenue Code," 7 Tax L. Rev. 439, 440 (1952).

great reliance. Petitioner presented three expert witnesses: George Newton, managing partner of an investment banking firm in St. Louis; Edward Townsend, an investment banker in New York City; and James Stradtner, general partner of a general brokerage and investment banking firm in New York City. Respondent presented Sigurd Wendin, chairman of the board of an investment counseling firm whose specialities include fair market value studies.

All of the expert witnesses considered the following factors:

(1) The provisions of the voting trust agreement and their effect on fair market value;

(2) Trading activity and market price of the unrestricted shares on the over-the-counter market;

(3) All financial and statistical data, including book value, types of income, capitalization, insurance in force, nature of business written, earnings, and dividends;

(4) The growth record of the company's income, earnings, and book value;

(5) Future expectations for the company's growth;

(6) The size of the investment represented by the certificates;

(7) The type of buyer who would be attracted by this kind of security; and

(8) Expenses anticipated in selling the certificates.

In addition, one or more of the experts considered other specific aspects of these factors including: the very active market for the company's free stock at the time of the deaths of Pearl and Angeline, the uncertainty contributed by the deaths of Pearl and Angeline, retention value, the possibility of mutualization, the company's management, and, comparisons with other life insurance companies of about the same size.

All of petitioners' expert witnesses first valued the 6,055 units in Pearl's estate at her death on December 7, 1962.

Newton began his valuation by explaining in detail the effect on the value of the certificates of each of the factors which he had considered. However, the principal factors forming the basis of his conclusion were that: (1) A buyer would be "locked in" by an investment in the certificates because the voting trust had more than 3 years to run and could be renewed; (2) one buying such a security would expect to receive at least a 2½-percent dividend yield on his investment; and (3) marketing such a large block of units would depress their value. Except for a few variations he made valuations for the other transfer dates in the same manner. In valuing the certificates in Angeline's estate as of January 3, 1963, he was of the opinion that the rise in the over-the-counter value of the unrestricted stock during December 1962 had little effect on the value of the certificates. In valuing the transfers made from 1947 through 1954, he believed that

the expected termination of the voting trust was so far in the future that the 2½-percent dividend yield would not have been adequate to sustain investor interest. For those early transfers he likened the certificates to Moody rated AA bonds and, therefore, capitalized the company's dividends at the rate established by the prevailing AA bond average.

Townsend's method of valuation was the most complex. He first established the value of an equivalent block of free shares by discounting the over-the-counter bid price of a free share to account for the expense of placing such a large block through commission agents. At Pearl's death on December 7, 1962, that discounted value was $2,300 per share. He assumed that one could reasonably expect the voting trust to be renewed for about 10 years. He then estimated the dividends that the company could be expected to pay out in future years; these estimates allowed him to calculate the projected formula price for the years after 1962. Next, since he believed that a potential investor would be worried about allowing his investment in certificates to be "locked in" for a period of several years, Townsend calculated how long an investor would consider it economical to be so bound. He first assumed that such an investor would desire at least a 10-percent rate of growth on his investment. He then assumed that an investor would be able to realize the 1962 fair market value of the free shares ($2,300 per share) upon termination of the voting trust.[14] Townsend calculated that the projected formula price would equal the 1962 value (assuming an appreciation rate of 10 percent) of $2,300 in 1973.[15] This date was significant because if the voting trust terminated before 1973, a purchaser of certificates would, upon the voting trust's termination, realize unrestricted shares that could be sold at an open market price which would be greater than the purchase price. On the other hand, if the voting trust did not terminate by 1973 the purchaser could, after 1973, sell his certificates at the formula price which would be greater than the original purchase price. In Townsend's words, 1973 would be the "stop loss" point at which the formula price (which was the minimum that one could expect from one's investment) would start to increase above the purchase price. Between 1962 and 1973, of course, an owner of certificates would also be receiving a return on his investment in the form of dividends.

Townsend valued the 6,755 units in Angeline's estate in an identical manner. With respect to the inter vivos transfers, however, he was

[14] As respondent pointed out, this approach further assumes that the underlying shares will not appreciate in value between the time of the investment in the certificates and the freeing of the underlying share by termination of the voting trust.

[15] And in fact 1973 would be the only year in which those two figures would coincide because the estimated formula price was a quantity which increased over the years while the amount needed to be invested (at 10 percent) in 1962 to return $2,300 in some future year was a quantity which decreased over the years.

of the opinion that the fair market value of the certificates was limited by the formula price because the termination of the trust was too remote an eventuality. He also reasoned that the smaller sizes of the inter vivos transfers would be a depressant factor on value since purchasers of such an unusual security would want to be able to buy in sufficient quantity in order to make the investment worthwhile. Furthermore, if larger blocks of units were available, they could be sold to several buyers. It would be easier to float an issue among several buyers because by purchasing these hybrid securities the buyers would confirm each other's judgment of the certificates' value.

Stradtner took a third, still different, approach toward valuation. His first critical assumption was that a person buying certificates at the time of Pearl's death could reasonably be expected to be "locked in" on his investment for a period of 13 years because of the restrictions in the voting trust and the provisions for extension. On account of this factor he believed it was necessary to project the free stock price to 1976 and then to discount that value back to 1962. He placed greatest emphasis on the projected earnings, projected book value, and projected dividends in arriving at a figure which he thought represented a reasonable projected fair market value for an unrestricted share in 1976. He then discounted this 1976 projected fair market value back to 1962 using a rate at which he thought investors in this type of security would risk a gamble. He arrived finally at a fair market value for the certificates by deducting expected selling expenses from this discounted value. He used the same method in determining the value of the certificates in Angeline's estate on January 3, 1963, and the value of the large blocks of units involved in the 1961 inter vivos transfers. However, with respect to the other inter vivos transfers Stradtner considered the key factor to be the formula price. In addition, for the 1954 and 1958 transfers, he believed that a reasonable buyer would strongly consider the fact that the company's dividends seemed to be increasing during those years.

Respondent's expert, Wendin, commenced his valuations with the block of 6,755 units in Angeline's estate on January 3, 1963. He first computed the value of an equal-sized block of unrestricted stock. He calculated a figure called "adjusted book value" which was determined in part by applying to the net book value of an unrestricted share adjustments for insurance in force and for the market-to-equity ratio derived by a comparison of other similarly situated life insurance companies. In much the same way, by taking into account increases in the amount of insurance in force [16] and net gains from operations and applying an average price-earnings ratio he established an "adjusted earnings value" for an unrestricted share. By comparing ad-

---

[16] Wendin emphasized that insurance in force was a very important index in valuing insurance company stock.

justed book value and adjusted earnings value with the most recent mean of bid and asked quotations for the unrestricted stock on the over-the-counter market, he finally arrived at an approximately fair market value for the unrestricted shares. He also took into account the "rock bottom" value for the certificates which he believed could be computed by capitalizing the company's dividends at the average dividend-price ratio for comparable insurance companies because, although a certificate holder would have to wait an indeterminate number of years to get unrestricted stock, he would still be receiving the benefits of a dividend flow. Since he believed that the mean of bid and asked prices on the over-the-counter market was a bit too high because of speculation during December 1962, he adjusted his opinion of the fair market value of the unrestricted shares downward. He finally discounted the value of the unrestricted shares by one-third and rounded off to arrive at a fair market value for the certificates themselves. Similarly, he compared adjusted book value, adjusted earnings value, mean of bid and asked prices, and dividend value and then discounted to arrive at fair market values for the certificates transferred at all of the other valuation dates in issue. For some of the earlier valuation dates he believed that the market price was not a clear reflection of fair market value of the free stock. As a result his determination of fair market value for those early dates was appreciably higher than the prevailing market price.

Wendin also made valuations on the assumption that the voting trust agreement would definitely end on April 28, 1966, the normal expiration date if the voting trust were not renewed. In asking for valuations under this assumption, respondent evidently had in mind his arguments concerning the ease with which the voting trust agreement could be terminated. Since we have found that the possibility of termination, though a factor, could not be so definite as respondent hypothesized, we do not discuss this second set of values.

The following summary reveals that the expert witnesses arrived at widely divergent values for the certificates:

| Item | Date | Number of units | Per unit value (dollars) | | | |
|---|---|---|---|---|---|---|
| | | | Newton | Townsend | Stradtner | Wendin |
| 1 | 11/18/47 | 1,100 | 140 | 100 | 100 | 140 |
| 2 | 11/20/47 | 60 | 140 | 100 | 100 | 140 |
| 3 | 12/29/48 | 60 | 139 | 100 | 100 | 130 |
| 4 | 12/29/48 | 60 | 139 | 100 | 100 | 130 |
| 5 | 11/15/50 | 60 | 147 | 100 | 100 | 120 |
| 6 | 12/23/52 | 230 | 131 | 100 | 100 | 350 |
| 7 | 10/14/53 | 500 | 120 | 100 | 100 | 400 |
| 8 | 12/29/53 | 185 | 122 | 100 | 100 | 470 |
| 9 | 12/29/53 | 185 | 122 | 100 | 100 | 470 |
| 10 | 12/29/54 | 96 | 164 | 108 | 125 | 800 |
| 12 [1] | 12/30/58 | 30 | 320 | 183 | 250 | 1,080 |
| 13 | 10/27/61 | 1,060 | 560 | 283 | 930–955 | 1,700 |
| 14 | 10/27/61 | 1,000 | 560 | 283 | 930–955 | 1,700 |
| Pearl's death | 12/ 7/62 | 6,055 | 550 | 850 | 950–975 | 1,800 |
| Angeline's death | 1/ 3/63 | 6,755 | 550 | 900 | 950–975 | 2,000 |

[1] It should be recalled that the value of item 11 is not in issue.

In order to illustrate the conflict regarding the proper method of evaluating unusual corporate securities, we have discussed in detail the valuation techniques employed by each of the expert witnesses. A major obstacle in comparing the experts' valuations arose because each of the experts based his valuations on different assumptions, almost all of which were not unreasonable, but which, nevertheless, represented logical discontinuities whose justification was founded only upon the experts' experience. One expert admitted that his method of computation constituted "a highly theoretical exercise," and indeed, this honest characterization applied equally well to the valuation methods utilized by the three other experts.

Upon reflection, the approaches of Stradtner and Wendin, who both placed heavy emphasis on adjusted book value and adjusted earnings value, were the most convincing to us.[17] Furthermore, Wendin's method of determining the value of the unrestricted shares underlying the certificates and then discounting for the various depressant factors attendant to the certificates appeared to be more direct than Stradtner's method of projecting the value of the certificates to some future date and then discounting that value back to the transfer date in question. Nonetheless, we were not in agreement with some of Wendin's conclusions. In particular, we do not think he took adequate consideration of the depressant effect of the voting and alienation restrictions that the voting trust agreement imposed on these most unusual securities. Also, with respect to some of the early transfers we do not believe that he adequately explained his impression that the market price of the free shares was not a clear reflection of their fair market value.

Athough, of the four expert opinions we have given Wendin's the greatest weight, "The testimony of the experts could be and was nothing more than approximation of value." *Kline* v. *Commissioner*, 130 F. 2d at 744. In the last analysis, in addition to the opinions of the experts we must independently consider each of the relevant factors bearing upon the certificates' value. *Nee* v. *Katz*, 163 F. 2d 256, 258 (C.A. 8, 1947); see *Alves* v. *United States*, an unreported case (W.D. Mo. 1969, 23 A.F.T.R. 2d 69–1932, 69–1 U.S.T.C. par. 12,601).

Therefore, we have considered all of the factors mentioned by the experts and in addition we have carefully examined all of the other relevant factors revealed in the record in order to arrive at the fair market value of the certificates. In conclusion, we find the following fair market values for the certificates: $143,000 for the 1,100 units (or $130 per unit) transferred by Pearl on November 18, 1947; $7,800 for the

---

[17] It appeared that Newton had less experience than the other three experts. Townsend, Stradtner, and Wendin had excellent credentials in the valuation field. However, Townsend's approach seemed to be more speculatively abstract than Stradtner's or Wendin's.

60 units (or $130 per unit) transferred by Angeline on November 20, 1947; $7,500 for the 60 units (or $125 per unit) transferred by Angeline on December 29, 1948; $7,500 for the 60 units (or $125 per unit) transferred by Pearl on December 29, 1948; $6,900 for the 60 units (or $115 per unit) transferred by Angeline on November 15, 1950; $69,000 for the 230 units (or $300 per unit) transferred by Angeline on December 23, 1952; $175,000 for the 500 units (or $350 per unit) transferred by Angeline on October 14, 1953; $74,000 for the 185 units (or $400 per unit) transferred by Angeline on December 29, 1953; $74,000 for the 185 units (or $400 per unit) transferred by Pearl on December 29, 1953; $62,400 for the 96 units (or $650 per unit) transferred by Angeline on December 29, 1954; $27,000 for the 30 units (or $900 per unit) transferred by Angeline on December 30, 1958; $1,590,000 for the 1,060 units (or $1,500 per unit) transferred by Angeline on October 27, 1961; $1,500,000 for the 1,000 units (or $1,500 per unit) transferred by Pearl on October 27, 1961; $9,688,000 for the 6,055 units (or $1,600 per unit) represented by the certificates in Pearl's estate at her death on December 7, 1962; and $11,483,500 for the 6,755 units (or $1,700 per unit) represented by the certificates in Angeline's estate at her death on January 3, 1963.

Not all of the inter vivos transfers were outright gifts. In 1947 Pearl transferred certificates to Joseph Bixby and Walter Bixby, Jr., in return for their promissory notes for $50,000 each, and $5,000 in cash from each. Similarly in 1953 Angeline transferred 500 units to Joseph Bixby in exchange for his promissory note for $50,000. By virtue of section 1002 of the 1939 Code Pearl and Angeline made gifts to the extent that the fair market value of the certificates they relinquished (less cash received) exceeded the fair market value of the notes received. In determining the extent to which Angeline and Pearl made gifts in 1947 and 1953, respondent has valued each of the three notes at $30,000.

"Transactions within a family group are subject to special scrutiny in order to determine if they are in economic reality what they appear to be on their face." *Jeannette W. Fitz Gibbon*, 19 T.C. 78, 84 (1952). The presumption is that a transfer between closely related parties is a gift. E.g., *Elizabeth N. Rude*, 48 T.C. 165, 172 (1967); *William Francis Mercil*, 24 T.C. 1150, 1153 (1955); *Evans Clark*, 18 T.C. 780, 783 (1952), affd. 205 F. 2d 353 (C.A. 2, 1953). Here, against the acknowledged background of carefully sustained gift programs, petitioners claim that the notes were worth their face amounts and that respondent's determinations of their value were "manifestly arbitrary and unreasonable."

It is true that the notes and the collateral agreements conformed

to every formality, but petitioners have failed to show the actual intentions among the parties. Cf. *Minnie E. Deal*, 29 T.C. 730, 736 (1958). Indeed, besides the notes themselves, petitioners have not presented any evidence to support their claim.[18]

In particular the notes bore no interest (absent default of an installment) and there is no evidence that the 4-percent interest provided for after such default was a reasonable interest rate in light of such factors as the boys' relative youth, the large sums involved, their ability to repay, the fact of default itself, and the prevailing interest rates in 1947 and 1953. Writings on the notes indicate that principal payments totaling $30,000 were made on the 1947 notes through 1953, and writings on the 1953 note indicate that principal payments totaling $27,000 were made until Angeline's death. There is no showing that the boys made any principal payments on the 1947 notes after August 1953,[19] and, furthermore, there is no indication that any interest was ever paid even though two installments appear to have been paid out of time.

From the meager evidence before us, we cannot hold that respondent's determinations were arbitrary or unreasonable.

Section 6019(a) provides that:

Any individual who in any calendar year makes any transfers by gift (except those which under section 2503(b) are not to be included in the total amount of gifts for such year) shall make a return with respect to the gift tax imposed by subtitle B.

In general, section 2503(b) excludes from taxable gifts the first $3,000 of gifts made to each donee. Sections 1006(a) and 1003(b)(3) of the 1939 Code embody substantially the same provisions.

Respondent sought to impose a penalty in docket Nos. 1577–67 and 1578–67 because Pearl and Angeline failed to file gift tax returns for certain years in which they made gifts. See sec. 6651(a); sec.

---

[18] Rule 32 of this Court's Rules of Practice places the burden of proof on petitioner. Petitioners argue that sec. 25.2512–4 of the Gift Tax Regulations establishes a presumption that the notes were worth their face value. That section provides:

"The fair market value of notes, secured or unsecured, is presumed to be the amount of unpaid principal, plus accrued interest to the date of the gift, unless the donor establishes a lower value. Unless returned at face value, plus accrued interest, it must be shown by satisfactory evidence that the note is worth less than the unpaid amount (because of the interest rate, or date of maturity, or other cause), or that the note is uncollectible in part (by reason of the insolvency of the party or parties liable, or for other cause), and that the property, if any, pledged or mortgaged as security is insufficient to satisfy it."

Accord, sec. 86.19(e), Regs. 108. But, the language of that section indicates that it applies only where a donor transfers notes for less than adequate consideration. It does not apply where, as in the instant case, the donor receives the notes as partial consideration for other property.

[19] The fact that neither of the 1947 notes was included in Pearl's estate does not show that they were fully paid off for we could as easily infer that after 1953 Pearl discharged the boys' remaining obligations on the notes.

3612(d)(1), 1939 Code.[20] On the other hand, petitioners claim that the failure to file returns was not due to willful neglect, but was due to reasonable cause. In essence, petitioners contend that Pearl and Angeline truly and reasonably believed that the certificates were worth no more than the formula price during the years in question. Proceeding upon that mistaken belief and applying the $3,000 exclusions allowable under section 2503(b) (and section 1003(b)(3) of the 1939 Code), Pearl and Angeline concluded that they did not have to file gift tax returns for the years in question.

Petitioners have the burden of showing that the failure to file the gift tax returns was, in fact, due to reasonable cause and not due to willful neglect. Rule 32, Tax Court Rules of Practice; *Harry L. Epstein*, 53 T.C. 459, 476 (1969). We have found no indication that the failure to file was due to willful neglect, and we conclude that the failure to file all but one of the gift tax returns was due to reasonable cause.

Since two expert witnesses, Stradtner and Townsend, expressed the opinion that the value of the gifts made through 1953 was equal to the value as determined by the formula price, Pearl and Angeline were justified in believing that the formula price was the sole index of the certificates' value for the years through 1953. However, for 1958 Townsend was the only expert who adhered to the belief that the formula price was the sole indicator of the certificates' value. The significant difference between the market value of $1,620 for an underlying share in 1958 and the formula price of $183.33 should have been an indication to Angeline that professional consultation was needed, but petitioners presented no evidence that she actually sought advice of a qualified accountant, attorney, or appraiser. Compare *Eleanor C. Shomaker*, 38 T.C. 192, 202 (1962), and *First County Nat. B. & T. Co. of Woodbury, N.J.* v. *United States*, 291 F. Supp. 837, 841 (D. N.J. 1968), with *May T. Hrobon*, 41 T.C. 476, 503 (1964). Angeline surely realized that she was making gifts of a highly unusual security. If she had exercised ordinary care and prudence, she should not have relied upon the formula price as the only indicator of the certificates' gift value in 1958. Therefore, the Commissioner properly imposed the penalty for that year.

*Decision will be entered under Rule 50.*

---

[20] See fn. 2 *supra*.